SUITUM *v.* TAHOE REGIONAL PLANNING AGENCY

No. 96–243.   Argued February 26, 1997—Decided May 27, 1997

726

*R. S. Radford* argued the cause for petitioner. With him on the briefs were *Robin L. Rivett, Victor J. Wolski,* and *William Patterson Cashill.*

*Richard J. Lazarus* argued the cause for respondent. With him on the brief were *J. Peter Byrne, J. Thomas Susich, Vicki E. Hartigan, Rachelle J. Nicolle,* and *Susan E. Scholley.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Anne S. Almy,* and *John A. Bryson.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *Timothy S. Bishop, Michael F. Rosenblum, John J. Rademacher,* and *Richard L. Krause;* for the Building Industry Association of Washington by *Richard M. Stephens* and *John M. Groen;* for the Defenders of Property Rights et al. by *Nancie G. Marzulla;* for the Institute of Justice by *William H. Mellor, Clint Bolick, Scott G. Bullock,* and *Richard A. Epstein;* for the Southeastern Legal Foundation by *Henry D. Granberry III;* for the Tahoe Lakefront Owners' Association by *Ronald A. Zumbrun, John H. Findley,* and *Meriem L. Hubbard;* for the Tahoe-Sierra Preservation Council, Inc., by *Lawrence L. Hoffman;* and for the Mayhews et al. by *Charles L. Siemon.*

Briefs of *amici curiae* urging affirmance were filed for the Governor of California et al. by *Michael A. Mantell;* for the State of Nevada et al. by *Frankie Sue Del Papa,* Attorney General of Nevada, and *William J. Frey* and *C. Wayne Howle,* Deputy Attorneys General, and by the Attorneys

JUSTICE SOUTER delivered the opinion of the Court.

Petitioner Bernadine Suitum owns land near the Nevada shore of Lake Tahoe.   Respondent Tahoe Regional Planning Agency, which regulates land use in the region, determined that Suitum's property is ineligible for development but entitled to receive certain allegedly valuable "Transferable Development Rights" (TDR's).   Suitum has brought an action for compensation under Rev. Stat. § 1979, 42 U. S. C. § 1983, claiming that the agency's determinations amounted to a regulatory taking of her property.   While the pleadings raise issues about the significance of the TDR's both to the claim that a taking has occurred and to the constitutional requirement of just compensation, we have no occasion to decide, and we do not decide, whether or not these TDR's may be considered in deciding the issue whether there has been a taking in this case, as opposed to the issue whether just compensation has been afforded for such a taking.   The sole question here is whether the claim is ripe for adjudication,

General for their respective States as follows: *Margery S. Bronster* of Hawaii, *Jeffrey L. Amestoy* of Vermont, *J. Joseph Curran, Jr.*, of Maryland, and *Joseph P. Mazurek* of Montana; for the State of New Jersey by *Peter Verniero*, Attorney General, *Mary C. Jacobson*, Assistant Attorney General, and *Rachel J. Horowitz*, Deputy Attorney General; for the State of New York by *Dennis C. Vacco*, Attorney General, *Barbara G. Billett*, Solicitor General, *Peter H. Schiff*, Deputy Solicitor General, and *John J. Sipos* and *Lisa M. Burianek*, Assistant Attorneys General; for the City of New York by *Paul A. Crotty, Leonard J. Koerner, Stephen J. McGrath*, and *Cheryl Payer*; for the League to Save Lake Tahoe by *E. Clement Shute, Jr.*, and *Christy H. Taylor*; for the National League of Cities et al. by *Richard Ruda*; and for the National Trust for Historic Preservation in the United States et al. by *Jerold S. Kayden, Louise H. Renne, R. Jeffrey Lyman*, and *Elizabeth S. Merritt.*

Briefs of *amici curiae* were filed for the American Planning Association by *Brian W. Blaesser* and *H. Bissell Carey III*; for the Columbia River Gorge Commission by *Lawrence Watters*; for the National Association of Home Builders et al. by *John J. Delaney, Lawrence R. Liebesman, Mary V. DiCrescenzo*, and *Nick Cammarota*; and for Dr. James Nicholas et al. by *John D. Echeverria.*

even though Suitum has not attempted to sell the development rights she has or is eligible to receive. We hold that it is.

I

In 1969, Congress approved the Tahoe Regional Planning Compact between the States of California and Nevada, creating respondent as an interstate agency to regulate development in the Lake Tahoe basin. See *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391, 394 (1979). After the 1969 compact had proven inadequate for protection of the lake and its environment, the States proposed and Congress approved an amendment in 1980, requiring the agency to adopt a plan barring any development exceeding such specific "environmental threshold carrying capacities" as the agency might find appropriate. Pub. L. 96–551, Arts. I(b), V(b), V(g), 94 Stat. 3234, 3239–3241.[1]

In 1987, the agency adopted a new Regional Plan providing for an "Individual Parcel Evaluation System" (IPES) to rate the suitability of vacant residential parcels for building and other modification. Tahoe Regional Planning Agency Code of Ordinances, ch. 37 (TRPA Code). Whereas any property must attain a minimum IPES score to qualify for construction, *id.,* § 37.8.E; App. 145, an undeveloped parcel in certain areas carrying runoff into the watershed (known as "Stream Environment Zones" (SEZ's)) receives an IPES score of zero, TRPA Code § 37.4.A(3). With limited exceptions not relevant here, the agency permits no "additional land coverage or other permanent land disturbance" on such a parcel. *Id.,* § 20.4.

[1] The 1980 compact defines "[e]nvironmental threshold carrying capacity" as "an environmental standard necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region. Such standards shall include but not be limited to standards for air quality, water quality, soil conservation, vegetation preservation and noise." Art. II(i), 94 Stat. 3235.

Although the agency's 1987 plan does not provide for the variances and exceptions of conventional land-use schemes, it addresses the potential sharpness of its restrictions by granting property owners TDR's that may be sold to owners of parcels eligible for construction, *id.*, §§ 20.3.C, 34.0 to 34.3. There are three kinds of residential TDR's. An owner needs both a "Residential Development Right" and a "Residential Allocation" to place a residential unit on a buildable parcel, *id.*, §§ 21.6.C, 33.2.A; the latter permits construction to begin in a specific calendar year, but expires at year's end, *id.*, § 33.2.B(3)(b). An owner must also have "Land Coverage Rights" for each square foot of impermeable cover placed upon land. App. 145; see also TRPA Code, ch. 20. All owners of vacant residential parcels that existed at the effective date of the 1987 plan (July 1, 1987), including SEZ parcels, automatically receive one Residential Development Right, *id.*, § 21.6.A; owners of SEZ property may obtain and transfer bonus points equivalent to three additional Residential Development Rights, *id.*, §§ 35.2.C, 35.2.D. SEZ property owners also receive Land Coverage Rights authorizing coverage of an area equal to 1% of the surface area of their land. *Id.*, §§ 20.3.A, 37.11. Finally, SEZ owners, like other property owners, may apply for a Residential Allocation, awarded by local jurisdictions in random drawings each year.[2] *Id.*, § 33.2.B; App. 98–99. All three kinds of TDR's may be transferred for the benefit of any eligible property in the Lake Tahoe region, subject to approval by the agency based on the eligibility of the receiving parcel for development. TRPA Code §§ 20.3.C, 34.1 to 34.3.

In 1972, Suitum and her late husband bought an undeveloped lot in Washoe County, Nevada, within the agency's jurisdiction, and 17 years later, after adoption of the 1987

---

[2] Counsel for the agency at oral argument represented that "at this point" there are "fewer applicants than there are allocations" in Washoe County, where petitioner's land is located, and there is thus a "100 percent chance of winning the [drawing]." Tr. of Oral Arg. 39–40.

Regional Plan, Suitum obtained a Residential Allocation through Washoe County's annual drawing. When she then applied to the agency for permission to construct a house on her lot, the agency determined that her property was located within a SEZ, assigned it an IPES score of zero, and denied permission to build. Suitum appealed the denial to the agency's governing board, which itself denied relief.

After the agency turned down the request for a building permit, Suitum made no effort to transfer any of the TDR's that were hers under the 1987 plan, and there is no dispute that she still has the one Residential Development Right that owners of undeveloped lots automatically received, plus the Land Coverage Rights for 183 square feet that she got as the owner of 18,300 square feet of SEZ land. It is also common ground that Suitum has the right to receive three "bonus" Residential Development Rights. Although Suitum has questioned the certainty that she would obtain a new Residential Allocation if she sought one, the agency has represented to this Court that she undoubtably would, see n. 2, *supra*.

Instead, Suitum brought this 42 U. S. C. § 1983 action alleging that in denying her the right to construct a house on her lot, the agency's restrictions deprived her of "all reasonable and economically viable use" of her property, and so amounted to a taking of her property without just compensation in violation of the Fifth and Fourteenth Amendments.[3] App. 15, 16. The agency responded by objecting, among other things, that Suitum's takings claim was not ripe due to her "failure to obtain a final decision by TRPA as to the amount of development . . . that may be allowed by" the agency. *Id.*, at 10. On cross-motions for summary judgment, the District Court ordered supplemental briefing on

---

[3] Suitum's complaint may have also raised substantive due process and equal protection claims, see App. 16, 153, but her petition for a writ of certiorari did not address those issues and they are not considered here. See n. 6, *infra*.

the nature of Suitum's TDR's, including "what [TDR's] can be transferred in [Suitum's] case and the procedures, prerequisites and value of such transfer as applicable in this case." *Id.,* at 89. The agency introduced an affidavit from a real estate appraiser, whose opinion was that the Residential Development Right that Suitum already has, and the three more to which she is entitled, have a market value between $1,500 and $2,500 each; that her Land Coverage Rights can be sold for $6 to $12 per square foot ($1,098–$2,196 total); and that her lot devoid of all TDR's would sell for $7,125 to $16,750. *Id.,* at 131–132. The appraiser also said that if Suitum were to obtain a Residential Allocation and sell it with a Development Right, together they would bring between $30,000 and $35,000. *Ibid.* As if in spite of the figures supplied by its own affidavit, however, the agency maintained that the "*actual* benefits of the [TDR] program for [Suitum] . . . can only be known if she pursues an appropriate [transfer] application," with the result that Suitum's claim was not ripe for adjudication. *Id.,* at 91. For her part, Suitum insisted that trying to transfer her TDR's would be an "'idle and futile act'" because the TDR program is a "sham,"[4] and she supplied the affidavit of one of the agency's former employees whose view was that "there is little to no value to [Suitum's TDR's] at the present time as . . . either [there is] no market for them or the procedure for transferring one particular right would restrict the opportunity to transfer a remaining right." *Id.,* at 135.[5]

The District Court decided that Suitum's claim was not ripe for consideration because "[a]s things now stand, there

---

[4] See Suitum's Response to Defendant's Memorandum Concerning its Transfer of Development Program 1–2.

[5] The District Court disregarded this affidavit, however, because "[t]here [was] no showing that [Suitum's affiant] is an expert . . . as to the valuation of development rights" sufficient to satisfy Federal Rule of Civil Procedure 56(e). No. CV–N–91–040–ECR (D. Nev., Mar. 30, 1994), App. to Pet. for Cert. C–2, n. 1.

is no final decision as to how [Suitum] will be allowed to use her property." No. CV–N–91–040–ECR (D. Nev., Mar. 30, 1994), App. to Pet. for Cert. C–3. Although the court found that "there is significant value in the transfer of [Suitum's TDR's], . . . until [specific] values attributable to the transfer program are known, the court cannot realistically assess whether and to what extent [the agency's] regulations have frustrated [Suitum's] reasonable expectations." *Id.*, at C–3 to C–4.

The Court of Appeals for the Ninth Circuit affirmed this ripeness ruling for the like reason that "[w]ithout an application for the transfer of development rights" there would be no way to "know the regulations' full economic impact or the degree of their interference with [Suitum's] reasonable investment-backed expectations," and without action on a transfer application there would be no " 'final decision from [the agency] regarding the application of the regulation[s] to the property at issue.' " [6]  80 F. 3d 359, 362–363 (1996). We granted certiorari to consider the ripeness of Suitum's takings claim, 519 U. S. 926 (1996), and now reverse.

## II

The only issue presented is whether Suitum's claim of a regulatory taking of her land in violation of the Fifth and Fourteenth Amendments is ready for judicial review under prudential ripeness principles.[7]  There are two independent

---

[6] The court held that "[t]hese ripeness requirements," while developed in the regulatory taking context, "are equally applicable to the due process and equal protection claims." 80 F. 3d, at 362, n. 1. We address only the ripeness requirements for Suitum's takings claim, however, and express no opinion on the ripeness of her other claims.

[7] "We have noted that ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno* v. *Catholic Social Services, Inc.*, 509 U. S. 43, 57, n. 18 (1993). The agency does not question that Suitum properly presents a genuine "case or controversy" sufficient to satisfy Article III, but maintains only that Suitum's action fails to satisfy our prudential ripeness requirements.

prudential hurdles to a regulatory takings claim brought against a state entity in federal court. *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), explained that a plaintiff must demonstrate that she has both received a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entity charged with implementing the regulations," *id.*, at 186, and sought "compensation through the procedures the State has provided for doing so," *id.*, at 194. The first requirement follows from the principle that only a regulation that "goes too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922), results in a taking under the Fifth Amendment, see, *e. g., MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340, 348 (1986) ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes"); see also *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1014–1019 (1992) (regulation " 'goes too far' " and results in a taking "at leas[t] in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted"). The second hurdle stems from the Fifth Amendment's proviso that only takings without "just compensation" infringe that Amendment; "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation," *Williamson County, supra*, at 195. Because only the "final decision" prong of *Williamson* was addressed below and briefed before this Court, we confine our discussion here to that issue.[8]

---

[8] We therefore do not decide whether *Williamson County*'s "state procedures" requirement has been satisfied in this case. Ordinarily, a plaintiff must seek compensation through state inverse condemnation proceedings before initiating a takings suit in federal court, unless the State does not provide adequate remedies for obtaining compensation. See *Williamson County*, 473 U. S., at 194–196. Suitum's counsel stated at oral argument

## A

In holding Suitum's claim to be unripe, the Ninth Circuit agreed with the agency's argument that Suitum had failed to obtain a final and authoritative decision from the agency sufficient to satisfy the first prong of *Williamson County, supra.* Although it is unclear whether the agency still urges precisely that position before this Court, see, *e. g.,* Brief for Respondent 21 (conceding that "[w]e know the full extent of the regulation's impact in restricting petitioner's development of her own land"), we think it important to emphasize that the rationale adopted in the decision under review is unsupported by our precedents.

*Agins* v. *City of Tiburon,* 447 U. S. 255 (1980), is the first case in which this Court employed a notion of ripeness in declining to reach the merits of an as-applied regulatory takings claim.[9] In *Agins,* the landowners who challenged zon-

---

that "the position of the Tahoe Regional Planning Agency is that they do not . . . have provisions for paying just compensation," Tr. of Oral Arg. 4, thus suggesting that the agency is not subject to inverse condemnation proceedings, and the agency's counsel did not disagree. Suitum's position therefore appears to be that the sole remedy against the agency for a taking without just compensation is a § 1983 suit for damages, such as she has brought here. Cf. *Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency,* 911 F. 2d 1331, 1341–1342 (CA9 1990). We leave this matter to the Court of Appeals on remand.

[9] Two years earlier, in *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978), we reached the merits of Penn Central's claim that the New York City Landmarks Preservation Commission's denial of permission to construct an office building on top of Grand Central Terminal was a taking, despite our observation that

"it simply cannot be maintained, on this record, that appellants have been prohibited from occupying *any* portion of the airspace above the Terminal. While the [City's] actions in denying applications to construct an office building in excess of 50 stories above the Terminal may indicate that it will refuse to issue a certificate of appropriateness for any comparably sized structure, . . . [t]he [City has] emphasized that whether any construction would be allowed depended upon whether the proposed addition 'would harmonize in scale, material, and character with [the Termi-

ing ordinances restricting the number of houses they could build on their property sued without seeking approval for any particular development on their land. We held that the only issue justiciable at that point was whether mere enactment of the statute amounted to a taking.[10]   *Id.*, at 260. Without employing the term "ripeness," the Court explained that because the owners "ha[d] not submitted a plan for development of their property as the [challenged] ordinances permit[ted], there [was] as yet no concrete controversy regarding the application of the specific zoning provisions." *Ibid.*

The following Term, *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981), toughened our nascent ripeness requirement.   There, coal producers and landowners challenged the enactment of the Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. § 1201 *et seq.*, as a taking of their property.   As in *Agins*, we concluded that an as-applied challenge was unripe, reasoning that "[t]here is no indication in the record that appellees ha[d] availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting . . . a variance from the [applicable provisions of the Act]," 452 U. S., at 297.[11]   *Hodel* thus held that where the regulatory regime

---

nal].'   Since appellants have not sought approval for the construction of a smaller structure, we do not know that appellants will be denied any use of any portion of the airspace above the Terminal."   *Id.*, at 136–137 (citation omitted).

[10] Such "facial" challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an "uphill battle," *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 495 (1987), since it is difficult to demonstrate that "'mere enactment'" of a piece of legislation "deprived [the owner] of economically viable use of [his] property."   *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 297 (1981).   Suitum does not purport to challenge the agency's regulations on their face.

[11] As in *Agins*, we found the *Hodel* plaintiffs' "facial" takings challenge to be ripe, but ruled it out on the merits.   452 U. S., at 295–297.

offers the possibility of a variance from its facial require-ments, a landowner must go beyond submitting a plan for development and actually seek such a variance to ripen his claim.

*Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), confirmed *Hodel*'s holding. In *Williamson County*, a developer's plan to build a residential complex was rejected by the local planning commission as inconsistent with zoning ordinances and subdivision regulations in eight different respects. This Court acknowledged that "[r]espondent ha[d] submitted a plan for developing its property, and thus ha[d] passed beyond the *Agins* threshold," 473 U. S., at 187, but nonetheless held the takings challenge unripe, reasoning that "among the factors of particular significance in the [takings] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations," *id.*, at 191, "factors [that] simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question," *ibid.* Thus, a developer must at least "resort to the procedure for obtaining variances . . . [and obtain] a conclusive determination by the Commission whether it would allow" the proposed development, *id.*, at 193, in order to ripen its takings claim.

*MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340 (1986), reaffirmed *Williamson County*'s requirement of a final agency position. In *MacDonald*, a developer purchased property and presented a tentative subdivision plan to the local planning commission. After the commission treated the proposal as inconsistent with the zoning regulations in several respects, the developer immediately filed suit. Without even relying on the character of the dry run in the submission of a merely tentative plan, we emphasized that in the course of litigation two state courts had given opinions that development of the property was possible

under the regulations in question, flatly contrary to the developer's conclusory allegation that the regulations required him to provide a greenbelt as a public gratuity. See 477 U. S., at 345–347. Hence, we held the claim unripe under the rationale of *Williamson County:* "'the effect [of] the Commission's application of the zoning ordinance . . . on the value of respondent's property . . . cannot be measured until a final decision is made as to how the regulations will be applied to [the developer's] property.'" *MacDonald, supra,* at 349 (quoting *Williamson County, supra,* at 199–200).

Leaving aside the question of how definitive a local zoning decision must be to satisfy *Williamson County*'s demand for finality,[12] two points about the requirement are clear: it applies to decisions about how a takings plaintiff's own land may be used, and it responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer. As the Court said in *MacDonald,* "local agencies charged with administering regulations governing property development are singularly flexible institutions; what they take with the one hand they may give back with the other." 477 U. S., at 350. When such flexibility or discretion may be brought to bear on the permissible use of property as singular as a

---

[12] *MacDonald* suggested that the *Williamson County* "final decision" requirement might sometimes require multiple proposals or variance applications before a landowner's case will be considered ripe. We wrote, for example, that "[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." 477 U. S., at 353, n. 9; compare *Williamson County,* 473 U. S., at 191 (applicant must obtain final definitive position on how regulations will be applied to the land in question), with *id.,* at 193 (applicant must obtain conclusive determination whether specific proposed development will be permitted). *Amici* the Mayhews et al. urge us to establish a rule that a takings plaintiff need only make a single proposal and a single request for a variance to ensure the ripeness of his claim. Brief for Mayhews et al. as *Amici Curiae* 22. That issue is not presented in this case.

parcel of land, a sound judgment about what use will be allowed simply cannot be made by asking whether a parcel's characteristics or a proposal's details facially conform to the terms of the general use regulations.

The demand for finality is satisfied by Suitum's claim, however, there being no question here about how the "regulations at issue [apply] to the particular land in question." *Williamson County, supra,* at 191. It is undisputed that the agency "has finally determined that petitioner's land lies entirely within an SEZ," Brief for Respondent 21, and that it may therefore permit "[n]o additional land coverage or other permanent land disturbance" on the parcel, TRPA Code § 20.4. Because the agency has no discretion to exercise over Suitum's right to use her land, no occasion exists for applying *Williamson County*'s requirement that a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel. The parties, of course, contest the relevance of the TDR's to the issue of whether a taking has occurred, but resolution of that legal issue will require no further agency action of the sort demanded by *Williamson County.*

## B

The agency nonetheless argued below, and the lower courts agreed, see *supra,* at 732–733, that there remains a "final decision" for the agency to make: action on a possible application by Suitum to transfer the TDR's to which she is indisputably entitled. This is not, however, the type of "final decision" required by our *Williamson County* precedents. Those precedents addressed the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise. No such question is presented here. The parties agree on the particular TDR's to which Suitum is entitled, and no discretionary decision

must be made by any agency official for her to obtain them or to offer them for sale. The only decision left to the agency is approval of a particular transfer of TDR's to make certain that a given potential buyer may lawfully use them. But whether a particular sale of TDR's may be completed is quite different from whether TDR's are salable; so long as the particular buyer is not the only person who can lawfully buy, the rights would not be rendered unsalable even if the agency were to make a discretionary decision to kill a particular sale. And the class of buyers is not even arguably so limited here, where there is no question so far as the law is concerned that TDR's may be bought and used for the benefit of all sorts of land parcels and lots.

## C

The agency's argument that Suitum's case is not ripe because no "'values attributable to [Suitum's TDR's] are known,'" Brief for Respondent 23 (quoting No. CV–N–91–040–ECR (D. Nev., Mar. 30, 1994), App. to Pet. for Cert. C–4, is just a variation on the preceding position, and fares no better. First, as to Suitum's rights to receive TDR's that she may later sell, we have already noted that little or no uncertainty remains. Although the value of a Residential Development Right may well be greater if it is offered together with a Residential Allocation, and although Suitum must still enter the lottery for the latter, there is no discretionary decision to be made in determining whether she will get one; in fact, the probability of her getting one is "100 percent" according to the agency, see Tr. of Oral Arg. 40, since there are fewer applications than available allocations, see id., at 39–40. But even if that were not the case, as it probably will not always be, it would be unreasonable to require Suitum to enter the drawing in order to ripen her suit. The agency does not, and surely could not, maintain that if the odds of success in the allocation lottery were low,

Suitum's takings claim could be kept at bay from year to year until she actually won the drawing; such a rule would allow any local authority to stultify the Fifth Amendment's guarantee. Rather, in such circumstances, the value attributable to the allocation Suitum might or might not receive in the drawing would simply be discounted to reflect the mathematical likelihood of her obtaining one.

Second, as to Suitum's right to transfer her TDR's, the only contingency apart from private market demand turns on the right of the agency to deny approval for a specific transfer on grounds that the buyer's use of the TDR's would violate the terms of the scheme or other local land-use regulation, and the right of a local regulatory body to deny transfer approval for the latter reason. See TRPA Code §§ 20.3.C, 34.2, 34.3. But even if these potential bars based on a buyer's intended use of TDR's should turn out to involve the same degree of discretion assumed in the *Williamson County* ripeness requirement, that discretion still would not render the value of the TDR's nearly as unknowable as the chances of particular development being permitted on a particular parcel in the absence of a zoning board decision that could quite lawfully be either yes or no. While a particular sale is subject to approval, salability is not, and the agency's own position assumes that there are many potential, lawful buyers for Suitum's TDR's, whose receipt of those rights would unquestionably be approved.

The valuation of Suitum's TDR's is therefore simply an issue of fact about possible market prices, and one on which the District Court had considerable evidence before it, see *supra,* at 731–732.[13] Of course, as the agency appears to be saying, see, *e. g.,* Brief for Respondent 22–23, the very best evidence of the value of Suitum's TDR's might be their actual

---

[13] Moreover, the court may, of course, request additional briefing on this subject if necessary, and a trial could be held if the issue cannot be decided on summary judgment.

selling price (assuming, of course, that the sale were made in good faith and at arm's length). But similar determinations of market value are routinely made in judicial proceedings without the benefit of a market transaction in the subject property. See, *e. g., United States* v. *819.98 Acres of Land, More or Less, Located in Wasatch and Summit Counties,* 78 F. 3d 1468, 1469–1470 (CA10 1996) (upholding valuation of condemned land based on expert testimony relating to comparable sales and discounted cash flow); *United States* v. *L. E. Cooke Co.,* 991 F. 2d 336, 338–339 (CA6 1993) (same with respect to valuation of mineral rights leases); see also 5 J. Sackman, Nichols' Law of Eminent Domain § 23–01, p. 23–6 (rev. 3d ed. 1997) ("[I]t is well established that the value of . . . land taken or injured by the exercise of the power of eminent domain may be shown by opinion evidence"); see generally 4 *id.,* § 12.02 (discussing establishment of market value of condemned land). While it is true that market value may be hard to calculate without a regular trade in TDR's, if Suitum is ready to proceed in spite of this difficulty, ripeness doctrine does not block her. In fact, the reason for the agency's objection is probably a concern that without much market experience in sales of TDR's, their market values will get low estimates. But this is simply one of the risks of regulatory pioneering, and the pioneer here is the agency, not Suitum.

## III

Finally, the agency argues (for the first time, before this Court) that Suitum's claim is unripe under the "fitness for review" requirement of *Abbott Laboratories* v. *Gardner,* 387 U. S. 136 (1967). *Abbott Laboratories* arose on a petition under the Administrative Procedure Act (APA), 5 U. S. C. §§ 701–704 (1964 ed., Supp. II), by a group of drug manufacturers seeking review of a labeling regulation promulgated by the Commissioner of Food and Drugs (FDA) but not yet the subject of any enforcement action against the manufacturers. The petitioners claimed that the FDA lacked statu-

tory authority to impose the new labeling requirement; the FDA countered that the claim was not ripe for judicial review for want of any proceedings to enforce the regulation.

The Court dealt with ripeness under a two-pronged test:

> "Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U. S., at 148–149 (footnote omitted).

Under the "fitness for review" prong, we first noted that the FDA's adoption of the labeling regulation was "final agency action" within the meaning of § 10 of the APA, 5 U. S. C. § 704, and then rejected the Government's argument that review must await enforcement. 387 U. S., at 149–152. We reasoned that "the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage" because promulgation of the regulations "puts petitioners in a dilemma": "Either they must comply with the [labeling] requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution." *Id.*, at 152 (internal quotation marks omitted). Similarly, the immediate impact of the regulation on the manufacturers satisfied the "hardship" prong: "Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious

penalties attached to noncompliance," hardship has been demonstrated and "access to the courts . . . must be permitted." *Id.*, at 153.

*Abbott Laboratories* is not on point. The drug companies in that case were challenging the validity of a regulation as beyond the scope of the FDA's authority. Whatever the arguable merit of the FDA's position on ripeness may have been, it rested on the fact that the manufacturers could have precipitated their challenge (if they had wanted) by violating the regulation and defending any subsequent prosecution by placing the regulation's validity in question. Suitum is in a different position from the manufacturers. She does not challenge the validity of the agency's regulations; her litigating position assumes that the agency may validly bar her land development just as all agree it has actually done, and her only challenge to the TDR's raises a question about their value, not about the lawfulness of issuing them. Suitum seeks not to be free of the regulations but to be paid for their consequences, and even if for some odd reason she had decided to bring things to a head by building without a permit, a § 1983 action for money would not be a defense to an equity proceeding to enjoin development. Indeed, to the extent that *Abbott Laboratories* is in any sense instructive in the disposition of the case before us, it cuts directly against the agency: Suitum is just as definitively barred from taking any affirmative step to develop her land as the drug companies were bound to take affirmative steps to change their labels. The only discretionary step left to an agency in either situation is enforcement, not determining applicability.

\* \* \*

Because we find that Suitum has received a "final decision" consistent with *Williamson County*'s ripeness requirement, we vacate the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

I concur in the judgment of the Court, and join its opinion except for Parts II–B and II–C. Those sections consider whether the Tahoe Regional Planning Agency (TRPA) must have reached a final decision regarding Suitum's ability to sell her Transferable Development Rights (TDRs), and whether the value of Suitum's TDRs must be known. That discussion presumes that the answers to those questions may be relevant to the issue presented at this preliminary stage of the present case: whether Suitum's takings claim is ripe for judicial review under the "final decision" requirement. In my view they are not relevant to that issue, and the Court's discussion is beside the point.

To describe the nature of the "final decision" inquiry, the Court's opinion quotes only the vague language of *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172 (1985), that there must be a "final decision regarding the application of the [challenged] regulations to the property at issue," *id.*, at 186, quoted *ante*, at 734, and of *MacDonald, Sommer & Frates* v. *Yolo County*, 477 U. S. 340 (1986), that "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes," *id.*, at 348, quoted *ante*, at 734. Unmentioned in the opinion are other, more specific, statements in those very cases (and elsewhere) which display quite clearly that the quoted generalizations (and the "final decision" inquiry) have nothing to do with TDRs. Later in *Williamson County*, for example, we explained that the purpose of the "final decision" requirement was to ensure that the Court can ascertain "how [the takings plaintiff] will be allowed to develop its property," *Williamson County, supra,* at 190. And on the very same page from which the Court extracted the vague statement, *MacDonald* says quite precisely that the essential function of the "final decision" re-

quirement is to ensure that there has been a "determination of the type and intensity of development legally permitted on the subject property," *MacDonald, supra,* at 348; and says later that "[o]ur cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it," 477 U. S., at 351. The Court fails even to mention, in its otherwise encyclopedic description of the development of the "final decision" requirement, the most recent of our opinions addressing the subject, *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992), in which we relied exclusively on these more precise formulations and did not mention the vague language quoted by the Court today, see *id.,* at 1011.

The focus of the "final decision" inquiry is on ascertaining the extent of the governmental restriction on land use, not what the government has given the landowner in exchange for that restriction. When our cases say, as the Court explains *ante,* at 734, that without a "final decision" it is impossible to know whether the regulation "goes too far," *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922), they mean "goes too far in restricting the profitable use of the land," not "goes not far enough in providing compensation for restricting the profitable use of the land." The latter pertains not to whether there has been a taking, but to the subsequent question of whether, if so, there has been just compensation.

In all of the cases discussed in Part II–A of the Court's opinion bearing on the question whether a "final decision" requisite to a takings claim had been made, the point at issue was whether the government had finally determined the permissible *use* of the land. In *Agins* v. *City of Tiburon,* 447 U. S. 255 (1980), discussed *ante,* at 735–736, the government had not yet determined how many houses the challenged zoning ordinance would permit on the plaintiff's property. In *Hodel* v. *Virginia Surface Mining & Reclamation Assn.,*

*Inc.,* 452 U. S. 264 (1981), discussed *ante,* at 736–737, the government had not yet determined whether a variance from the land-use restrictions of the Surface Mining Control and Reclamation Act of 1977 would be allowed. In *Williamson County, supra,* discussed *ante,* at 737, the government had not yet determined whether it would approve the developer's plan to build a residential complex. And in *MacDonald, supra,* discussed *ante,* at 737–738, the government had again not yet determined whether the developer's subdivision plan would be approved.

TDRs, of course, have nothing to do with the use or development of the land to which they are (by regulatory decree) "attached." The right to use and develop one's own land is quite distinct from the right to confer upon someone else an increased power to use and develop *his* land. The latter is valuable, to be sure, but it is a *new* right conferred upon the landowner in exchange for the taking, rather than a *reduction* of the taking. In essence, the TDR permits the landowner whose right to use and develop his property has been restricted or extinguished to extract money from others. Just as a cash payment from the government would not relate to whether the regulation "goes too far" (*i. e.,* restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking; and just as a chit or coupon from the government, redeemable by and hence marketable to third parties, would relate not to the question of taking but to the question of compensation; so also the marketable TDR, a peculiar type of chit which enables a third party not to get cash from the government but to use his land in ways the government would otherwise not permit, relates not to taking but to compensation. It has no bearing upon whether there has been a "final decision" concerning the extent to which the plaintiff's land use has been constrained.

Putting TDRs on the taking rather than the just-compensation side of the equation (as the Ninth Circuit did

below) is a clever, albeit transparent, device that seeks to take advantage of a peculiarity of our Takings-Clause jurisprudence: Whereas once there *is* a taking, the Constitution requires just (*i. e.*, full) compensation, see, *e. g.*, *United States v. 564.54 Acres of Monroe and Pike County Land*, 441 U. S. 506, 510 (1979) (owner must be put "'in as good a position pecuniarily as if his property had not been taken'"); *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 326 (1893) ("[T]he compensation must be a full and perfect equivalent for the property taken"), a regulatory taking generally does not *occur* so long as the land retains substantial (albeit not its full) value, see, *e. g.*, *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978). If money that the government-regulator gives to the landowner can be counted on the question of whether there *is* a taking (causing the courts to say that the land retains substantial value, and has thus not been taken), rather than on the question of whether the compensation for the taking is adequate, the government can get away with paying much less. That is all that is going on here. It would be too obvious, of course, for the government simply to say "although your land is regulated, our land-use scheme entitles you to a government payment of $1,000." That is patently compensation and not retention of land value. It would be a little better to say "under our land-use scheme, TDRs are attached to every parcel, and if the parcel is regulated its TDR can be cashed in with the government for $1,000." But that still looks too much like compensation. The cleverness of the scheme before us here is that it causes the payment to come, not from the government *but from third parties*—whom the government reimburses for their outlay by granting them (as the TDRs promise) a variance from otherwise applicable land-use restrictions.

Respondent maintains that *Penn Central* supports the conclusion that TDRs are relevant to the question whether there has been a taking. In *Penn Central* we remarked that because the rights to develop the airspace above Grand Cen-

tral Terminal had been made transferable to other parcels in the vicinity (some of which the owners of the terminal themselves owned), it was "not literally accurate to say that [the owners] have been denied *all* use of [their] pre-existing air rights"; and that even if the TDRs were inadequate to constitute "just compensation" if a taking had occurred, they could nonetheless "be taken into account in considering the impact of regulation." *Id.*, at 137 (emphasis in original). This analysis can be distinguished from the case before us on the ground that it was applied to landowners who owned at least eight nearby parcels, some immediately adjacent to the terminal, that could be benefited by the TDRs. See *id.*, at 115. The relevant land, it could be said, was the aggregation of the owners' parcels subject to the regulation (or at least the contiguous parcels); and the use of that land, as a whole, had not been diminished. It is for that reason that the TDRs affected "the impact of the regulation." This analysis is supported by the concluding clause of the opinion, which says that the restrictions "not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties." *Id.*, at 138. If *Penn Central*'s one-paragraph expedition into the realm of TDRs were not distinguishable in this fashion, it would deserve to be overruled. Considering in the takings calculus the *market* value of TDRs is contrary to the import of a whole series of cases, before and since, which make clear that the relevant issue is the extent to which use or development of the land has been restricted. Indeed, it is contrary to the whole principle that land-use regulation, if severe enough, can constitute a taking which must be *fully* compensated.

I do not mean to suggest that there is anything undesirable or devious about TDRs themselves. To the contrary, TDRs can serve a commendable purpose in mitigating the economic loss suffered by an individual whose property use is restricted, and property value diminished, but not so sub-

stantially as to produce a compensable taking. They may also form a proper part, or indeed the entirety, of the full compensation accorded a landowner when his property *is* taken. Accord, *Penn Central, supra*, at 152 (REHNQUIST, J., dissenting) (noting that Penn Central had been "offered substantial amounts" for its TDRs and suggesting the appropriateness of a remand for a determination of whether the TDRs are valuable enough to constitute full compensation). I suggest only that the relevance of TDRs is limited to the compensation side of the takings analysis, and that taking them into account in determining whether a taking has occurred will render much of our regulatory takings jurisprudence a nullity, see Comment, Environmental Interest Groups and Land Regulation: Avoiding the Clutches of *Lucas v. South Carolina Coastal Council*, 48 U. Miami L. Rev. 1179, 1212 (1994).

In sum, I would resolve the question of whether there has been a "final decision" in this case by looking only to the fixing of petitioner's rights to use and develop her land. There has never been any dispute over whether that has occurred. Before bringing the present suit, petitioner applied for permission to build a house on her lot, and was denied permission to do so on the basis of TRPA's determination that her property is located within a "Stream Environment Zone"—a designation that carries the consequence that "[n]o additional land coverage or other permanent land disturbance shall be permitted," TRPA Code § 20.4. Respondent in fact concedes that "[w]e know the full extent of the regulation's impact in restricting petitioner's development of her own land," Brief for Respondent 21. That is all we need to know to conclude that the "final decision" requirement has been met.