OPINION OF THE COURT
William L. Underwood, Jr., J.
*764 The matter sub judice is an action which challenges the constitutionality of the Long Island. Pine Barrens Protection Act (ECL 57-0103 et seq.; L 1993, chs 262, 263 [the Act]) as it is written and as the Act is applied to individuals affected by it.
This controversy is occasioned by a clash between two dynamic impulses, the collective right to preserve natural resources and the individual right of property. Both of these rights are essential constituents of society. Neither, however, is absolute. The role of the court is to balance these two interests under the aegis of our Constitution.
Plaintiffs assert, inter alia, that the Long Island Pine Barrens Protection Act as written and applied has created a per se physical taking; a regulatory taking; a temporary regulatory taking of property without compensation under the New York Constitution; a violation of Federal and State constitutional due process; a violation of equal protection rights under 42 USC § 1983; an inverse condemnation; and a de facto appropriation of property.
The immediate application is a motion by defendants to dismiss which was converted to a motion for summary judgment by the court (CPLR 3211 [c]). We have accepted several supplemental memoranda of law from the parties. The last submission was accepted on January 21,1998. At this juncture, the court commends both plaintiffs’ and defendants’ counsel for the quality of their respective briefs, which do credit to our profession.
We begin our analysis with a discussion of the rights of the plaintiffs as freeholders.
From a historical perspective, the right of property has always been a cornerstone of the common law. The Great Charter of English Liberties (commonly referred to as the Magna Carta) contains three references to individual property rights (arts 28, 30, 31). At the time of our Revolution, one of our Founding Fathers specifically declared the commonly held belief that, “ ‘[t]he right of property is the guardian of every other right, and to deprive the people of this, is in fact to deprive them of their liberty’ ” (Belz, Property and Liberty Reconsidered, 45 Vand L Rev 1015, 1016-1017 [1992], citing Ely, The Guardian of Every Other Right, at 26 [Oxford 1992], quoting Lee, An Appeal to the Justice and Interests of the People of Great Britain, in The Present Dispute with America, at 14 [4th ed 1775]). In our Constitution’s Bill of Rights this deference is witnessed by specific safeguards (i.e., due process *765 and compensation) being addressed to rights of property. As the first Justice Harlan commented “[d]ue protection of the rights of property has been regarded as a vital principle of republican institutions” (Chicago, Burlington & Quincy R. R. Co, v Chicago, 166 US 226, 235-236 [1897]). The expression of this doctrine is best enshrined in Blackstone’s immortal observation: “There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.” (2 Blackstone, Commentaries on the Laws of England, ch I, at 2.)
Despite this inspiring declaration, even Sir William Blackstone acknowledged that the right of property was to be balanced against the collective interests of the majority, that rights of “an individual, may be restrained by positive laws enacted for reasons of state or for the supposed benefit of the community” (id., at 411). Out of respect for the dignity accorded the right of property, infringements by positive law (in our country) were curbed by the tripartite guardians of due process, equal protection and just compensation (NY Const, art I, §§ 6,11, 7 [a], respectively). Government regulation of private property found its justification in the General Welfare Clause and police powers required to execute the “Necessary and Proper” Clause of the Constitution (US Const Preamble; art I, § 8, cl [1]).
With their power (rather than their limitations) in mind, Legislatures enacted (and courts upheld) progressively more onerous restraints on the rights of property until the balance became clearly inequitable (see, Dolan v City of Tigard, 512 US 374; compare, Penn Cent. Transp. Co. v New York City, 438 US 104 [1978]). It wasn’t until the Court of Appeals rendered its decision in Manocherian v Lenox Hill Hosp. (84 NY2d 385 [1994]) that a signal was given indicating that New York had adopted the United States Supreme Court’s recent views (e.g., Dolan v City of Tigard) on the enhanced deference which must be accorded property rights.
Against the individual right of property, so eloquently argued by plaintiffs’ counsel, is set the collective interest in preserving the environment. As discussed infra, the role of government as the guardian of natural resources is actually of great antiquity.
Prior to the common law, the civil law held that certain lands were always to be set aside as public trusts. The great *766 compendium of the Emperor Justinian declared that, “By natural law, these things are common property of all: air, running water, the sea, and with it the shores of the sea.” (Lazarus, Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine, 71 Iowa L Rev 631, 633-634 [1986], citing 2 Insts of Justinian, tit 1, parts 1-6, at 65 [Thomas trans 1975].) Within the context of environmental stewardship, the civil law versus common-law distinction becomes blurred. Indeed, the common law specifically allows us to resort to imperial decrees to compliment English precedent, witness Lord Coke’s maxim “Lex scripta si cesset, id custodiri oportet quod moribus et consuetudine inductum est * * * et si id non apparent, tunc jus quo urbs Romana utitur servari oportet” (7 Coke 19 [emphasis supplied]). The application of the Jus publicum to the foreshore is a specific example of this maxim (Smith v State of New York, 153 AD2d 737 [2d Dept 1989]). Contrary to popular misconception, the common law did speak on the subject of environmental regulation. The Forest Laws, predating the Plantagenets, protected huge tracts of English land from molestation. Special “Forest Courts” existed to try and punish “all offenders against vert and venison” (3 Blackstone, Commentaries on the Laws of England, at 71). Before the birth of our Republic (when the King’s writ extended to this side of the Atlantic), the frontiersman clearing his land could not ply his axe against a tree bearing the “King’s Broad Arrow”. The Massachusetts Bay Colony Charter of 1692 contained provisions dealing with the conservation of resources, particularly minerals such as “Gold and Silver Oar [sic], and precious stones”.
It is true that the purpose of the Forest Laws was to preserve woodlands for the use and pleasure of one man — the King. Likewise, the “Broad Arrow” preserved trees, not for verdant repose, but to build the “Wooden Walls of England” made up of His Majesty’s ships. We must not forget, however, that in casting off the monarchy the royal prerogatives were not extinguished, but merely transferred to the people of the United States (Matter of Carnegie Trust Co., 206 NY 390, 397 [1912]; People v Van Rensselaer, 9 NY 291, 320 [1853]). The aforementioned kingly rights were divided among the formal branches of the Government, and the people as a whole (1 Story, Commentaries on the Constitution of the United States § 201, at 186). In 1779, the New York Legislature stated that all royal property rights “shall be vested in the people of this state, in whom the sovereignty and seigniory thereof, are and were *767 united and vested, on and from the said ninth day of July, in the year of our Lord one thousand seven hundred and seventy-six” (L 1779, ch 25, § 14, codified at Public Lands Law § 4). Thus the people (in their sovereign capacity) can collectively enjoy the environmental prerogatives formerly belonging to the monarch. Upon the heels of the common law, the statutes of this State have addressed and protected resources for over a hundred years, beginning with the Forest Preserve Act of 1885 (L 1885, ch 283). This statute eventually led to the adoption of article XTV of the NY Constitution, the “forever wild” clause of the Adirondacks. Despite its obvious importance, however, the exercise of this collective right can never justify a suspension (either directly or indirectly) of the constitutional safeguards for individual rights (see, Matter of Keystone Assocs. v Moerdler, 19 NY2d 78, 90 [1966]).
The recitation of the history of environmental regulation (and the right of property) is not set forth for academic interest, it is to demonstrate the prudence of following established custom, especially when those customs, by virtue of their antiquity, give proof of the fact that they are naturally derived. For those who feel that the incremental change allowed by the common law is too slow compared to statute, we refer those disbelievers to the holding in Somerset v Stewart (98 Eng Rep 499 [KB 1772]), which stands as an eloquent monument to the fallacy of this view. We now turn our attention to the specific allegations in this case.
Initially, our standard of review entails a presumption of good faith on the part of the Legislature and constitutionality for its mandates (41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325 [1987]; Lighthouse Shores v Town of Islip, 41 NY2d 7,11-12 [1976]; McKinney’s Cons Laws of NY, Book 1, Statutes § 151). Let us assume, arguendo, that the Long Island Pine Barrens Protection Act contains language which might be deemed repugnant. If the statute is “susceptible of two constructions, one of which will make it constitutional and the other unconstitutional, the former will be adopted” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [c], at 324). Additionally, the burden is on the plaintiffs to establish unconstitutionality beyond a reasonable doubt (ibid.; see Matter of Schultz Mgt. v Board of Stds. & Appeals, 103 AD2d 687, affd 64 NY2d 1057). This, they have failed to do.
The Act established a Pine Barrens Commission to oversee the administration of the Act. The powers of this Commission include the granting of building permits for those owners who *768 can demonstrate hardship (ECL 57-0121 [10]). Contrary to plaintiffs averments, the defendants have documented several instances where this power has been exercised by the defendant Board. This mechanism is relatively prompt. The Commission is required to make a final decision on any core area permit application within 60 days (ECL 57-0121 [10] [c] [iii]). If the feeholder is dissatisfied with the Commission’s determination, the statute further provides for judicial review (ECL 57-0135). Upon a finding of an uncompensated taking, the Commission is given two options. It “may set aside the determination of such governing body [such as a local municipality] or if the land so regulated otherwise meets the goals and objectives of this article and if the commission or the governing body has sufficient funds therefor, the commission or the governing body may acquire such land * * * under the power of eminent domain” (ibid.).
Although the wording is arguably permissive on the subject of compensation, we agree with the defendants’ contention that it can and will be construed in a mandatory (and constitutional) manner. The court, short of persuasion, admonishment and injunction, cannot prevent a public official, in futuro, from impermissibly depriving a person of property under color of law. A statute will not be struck down based on such a speculative contingency. In summary, the Pine Barrens Act promotes a legitimate government interest in a constitutionally permissible manner (Bonnie Briar Syndicate v Town of Mamaroneck, 242 AD2d 356 [2d Dept 1997]). It will be upheld by this court.
The compensation provided under the Act (ECL 57-0119 [6] |j]) includes a transfer of development rights (TDR). This term is further defined tmder section 261-a (1) (d) of the Town Law.
There are two ways to view the Pine Barrens TDRs: Either as compensation for a taking or as a factor in determining whether a taking has occurred at all. The understandable confusion in this application has been addressed by Justice Scalia in his opinion (concurring, joined by O’Connor and Thomas, JJ.) in Suitum v Tahoe Regional Planning Agency (520 US 725 [1997]). Applying his equivalent of Ockham’s Razor to the subject of TDRs, Justice Scalia concluded that consideration of TDRs must be “limited to the compensation side of the takings analysis [because] * * * taking them into account in determining whether a taking has occurred will render much of our regulatory takings jurisprudence a nullity” (supra, 520 US, at 750 [Scalia, concurring in part], citing Comment, Environmental Interest Groups and Land Regula *769 tion: Avoiding the Clutches of Lucas v South Carolina Coastal Council, 48 U Miami L Rev 1179, 1212 [1994]). Indeed, we find that all of the salient language in Suitum v Tahoe Regional Planning Agency actually supports the defendants’ position. In Suitum, the plaintiff, having made application to the statutorily authorized agency for a building permit, suffered a denial of her request. She pursued an administrative appeal and had received a specific amount of TDRs (520 US, at 739-740, supra). The facts in Suitum are readily distinguishable from the case at hand because the instant statute requires either condemnation/compensation or the granting of a building permit. Assuming, arguendo, that a taking exists, is a TDR sufficient compensation under the 5th Amendment? The Pine Barrens TDRs may be adequate compensation for the plaintiffs’ property. There is some case law which indicates that a person who has suffered a depredation of property at the sovereign’s hands is entitled to compensation in cash (United States v Miller, 317 US 369, 373 [1943], citing Monongahela Nav. Co. v United States, 148 US 312, 326; Olson v United States, 292 US 246, 254 [1934]; see, Seaboard Air Line Ry. Co. v United States, 261 US 299 [1923]). This case law, however, ignores venerable Government practice in providing new feeholds (in lieu of money) in return for land confiscated from indigenous tribes, a practice which dated to the early years of the 19th century (Singer, Sovereignty and Property, 86 Nw U L Rev 1). As Justice Scalia noted in Suitum, a TDR may be considered “the entirety, of the full compensation accorded a landowner when his property is taken” (520 US, at 750, supra). Alternatively, a reviewing court may consider them lacking. This question, however, is premature.
The plaintiffs’ reliance on the holdings in cases such as French Investing Co. v City of New York (39 NY2d 587) is misplaced. French did consider facts which are similar to the matter before us. The City of New York rezoned two private parks in such a fashion as to open them to the public. The zoning regulation “further provided for the granting to the defendant property owners of transferable development (air) rights usable elsewhere. It created the transferable rights by severing the above-surface development rights from the surface development rights” (supra, at 590). In analyzing the subject zoning resolution, the French Court also voiced the concern (which we share) that, “The ultimate evil of a deprivation of property, or better, a frustration of property rights, under the guise of an exercise of the police power is that it forces the owner to as *770 sume the cost of providing a benefit to the public without recoupment” (supra, at 596). What distinguishes French, however, is the transfer of development rights mechanism. The French Court admitted that a TDR provision in a statute “may not be disregarded in determining whether the ordinance has destroyed the economic value of the underlying property” (supra, at 597, citing Newport Assocs. v Solow, 30 NY2d 263, 268 [concurring opn], cert denied 410 US 931). The New York City zoning resolution, however, severed development rights from the affected parcels without any assurance that they could ever be given tangible form (supra, at 597, 598). It is this court’s opinion that the TDR provisions in the instant statute do “assure preservation of the very real economic value of the development rights as they existed when still attached to the underlying property [citations omitted]” (supra, at 598). The TDR mechanism in the immediate controversy resembles the “Chicago Plan” referred to (with approbation) by the French Court (supra, 599). Additionally, the TDRs reviewed by French were mandatory and were the sole meliorative measure offered to feeholders. In the case at bar, the TDR is one of several options.
The holding in Keystone Assocs. v Moerdler (19 NY2d 78 [1966], supra) is also distinguishable from the matter before us. Keystone articulated three principles: (1) a temporary deprivation of property triggers the Takings Clause of the US Constitution; (2) compensation must be certain; and (3) the determination of same is a judicial function. None of these principles has been offended by the Pine Barrens Act as written or applied by the respondents. As noted supra, ECL 57-0121 (10) (c) (iii) and ECL 57-0135 satisfy due process requirements and the need for tangible compensation subject to judicial review.
The remaining case law (and argument) relied upon by plaintiffs also fail to provide succor. This constrains the court to grant judgment in favor of the defendants and against the plaintiffs. The court declares the Long Island Pine Barrens Protection Act to be constitutional and plaintiffs’ complaint is dismissed.
Plaintiffs have urged the court to consider the holding in an action by the plaintiffs against the Town of Southampton (index No. 93-04906). Although the same property is involved in both suits we find that the cases are essentially dissimilar. The court in this case is reviewing the actions of different defendants. It would be inappropriate for us to take the actions of the offending municipality in W.J.F. Realty Corp. v Town of *771 Southampton and attribute them to the separate and distinct entities before us. Moreover, a perusal of the findings in Justice Seidell’s decision demonstrates that the defendants therein did not comply with ECL 57-0123 (1) (in contrast with the case at bar).
In defense of the Pine Barrens Act, the defendants have proffered evidence concerning the necessity of conserving drinking water. Plaintiffs have countered this by offering evidence that the aquifer under the Pine Barrens can be maintained even if homes are constructed on every half acre. The discussion of environmental regulation, a legacy stretching from the ab urbe condita through the present day, has a common thread and a common purpose: The assumption that the conservation of resources is intrinsically good and necessary for the continuance of society. Accordingly, conservation laws need no specific scientific justification and admit to no rebuttal on the basis of utility. In enacting environmental mandates (as in protecting the right of property), we are merely discharging our obligation under the societal contract between “Those who are dead, those who are living and those who are yet to be born” (Burke, Selected Writings and Speeches of Edmund Burke, at 318 [Knopf 1949]). It may come to pass that future generations will find their drinking water elsewhere. The present studies of endangered species may be cast into disrepute. As is their right, our successors may repeal the questioned legislation and put the Pine Barrens to the plow, industry, or some other useful occupation. Hopefully, they will balance this act with a setting aside of land somewhere else. Their ultimate actions are of no moment. This generation’s duty has been discharged merely by setting aside this land for their use under the doctrine of the public trust.