**RANDY'S SANITATION, INC., Plaintiff,**

v.

**WRIGHT COUNTY, MINNESOTA; Patrick Sawatzke; and Kenneth Jude; Defendants.**

**No. 98–1205 PAM/JGL.**

United States District Court, D. Minnesota.

Sept. 14, 1999.

Robert Edward Cattanach, Michael R Drysdale, Alexandra B Klass, Dorsey & Whitney, Minneapolis, MN, for plaintiff.

John M Baker, Larry Dale Espel, Clifford M Greene, Kevin G. Ross, Greene Espel, Minneapolis, MN, for defendant.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court upon two Motions for Partial Summary Judgment by Plaintiff Randy's Sanitation, Inc., and Defendants' Motion for Summary Judgment. For the following reasons, Plaintiff's motions are granted in part and denied in part; Defendants' motion is also granted in part and denied in part.

## BACKGROUND

In 1990, Wright County began constructing a solid waste composting facility ("the Facility") in order to address the problems of solid waste accumulation and perceived inadequate landfill capacity. The County financed its $13.8 million facility through general obligation bonds. To guarantee a continuous flow of waste to the Facility, and to ensure its profitability, the County passed a Waste Designation Ordinance in 1992. In relevant part, the Ordinance required that all solid waste generated in Wright County be processed at the Facility at a cost to haulers of $89 per ton. This was at least $40 in excess of the going market rate at any time. (*See* Berkman Rpt. 17.) Naturally, waste haulers in Wright County had to increase the fees they charged customers. As a result, many residents of Wright County began openly ignoring the County's waste management system and turned instead to more informal means of waste disposal, such as backyard burning. (*See* Davis Dep. at 340.)

After the Eighth Circuit affirmed this Court's decision against the constitutionality of interstate waste designation in *Waste Systems Corp. v. County of Martin*, 985 F.2d 1381 (8th Cir.1993), aff'g 784 F.Supp. 641 (D.Minn.1992), the County suspended the Ordinance as it applied to the flow of solid waste across interstate lines. In this form ("intrastate designation"), the Ordinance allowed entities within Wright County to send waste out of state for disposal. However, any waste which was to be disposed of within Minnesota had to be taken to the Facility.

Plaintiff Randy's Sanitation, Inc. ("Randy's") is a Wright County-based collector and hauler of commercial and residential waste. In 1993, Randy's developed plans to construct a Transfer Station to facilitate the transportation of waste out of Wright County. Without such a station, the possibility of sending waste out of state was illusory. Randy Roskowiak, the owner of Randy's, met with the County's Planning and Zoning Director, Thomas Salkowski, to discuss building such a station. Salkowski presented Randy's with two options. First, Randy's could seek to have the zoning designation of its property changed from B–2 (commercial) to I–1 (light industrial). Failing that, Randy's had a second option: it could pursue a conditional use permit to build the transfer station as a "freight transportation terminal," which would be a conditional use in the B–2 zone. Randy's first sought to have its property re-zoned, as this would give it the most flexibility for future planning. As part of its plan, Randy's voluntarily offered to continue to take all its Wright County waste to the Facility, as well as refusing to take any other waste generated in the County out of state. Salkowski prepared a report on Randy's proposal for the County. Therein, he expressed concern that Randy's promise to keep Wright County waste in the County was unenforceable. (*See*

Salkowski Dep. at 192–93.) Randy's took this as a hint that the County was still concerned with a lower level of waste flow to its Facility. In November 1993, the County Planning Commission denied the re-zoning request, expressing concern over "spot zoning." It did, however, grant Randy's a conditional use permit for a recycling facility smaller than that which Randy's had sought.

The following year, Randy's sought a conditional use permit to construct a transfer station as a "freight transportation terminal" under the current B–2 zoning designation. County Environmental Officer Chuck Davis pointed out to the Planning Commission that such a facility would have a "profound impact ... on the management of solid waste in Wright County." In November 1994, the Planning Commission rejected Randy's request for the conditional use permit, formally deciding that a transfer station was not a "freight transportation terminal" within the meaning of the zoning ordinances.

In May 1996, the County further eroded the scope of the original Ordinance by removing the requirement of intrastate designation as well. The County took this action after Judge Doty of this Court determined that intrastate designation as adopted by Hennepin County and Ramsey County also violated the Commerce Clause. *See Ben Oehrleins & Sons & Daughter v. Hennepin Cty.*, 922 F.Supp. 1396 (D.Minn.1996); *Poor Richards, Inc. v. Ramsey County.*, 922 F.Supp. 1387 (D.Minn.1996). Thereafter, waste haulers could lawfully transport waste either to the County's facility or anywhere else, either within or without Minnesota.

On April 20, 1998, six years to the day after the Ordinance originally took effect, Randy's filed suit against the County. Randy's claims (1) that interstate and intrastate designation both violated the Dormant Commerce Clause of the United States Constitution; (2) the County's denial of its permit requests violated the Dormant Commerce Clause; (3) the County's denial of its request for a conditional use

permit violated its substantive due process rights; and (4) the County and two of its officers tortiously interfered with Randy's existing and prospective contractual relations. Both sides have now moved, to varying degrees, for summary judgment.

## STANDARD

Summary judgment is appropriate if there is no genuine issue of material fact, and a party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court determines materiality from the law governing the claim. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *See id.* A material fact dispute is "genuine" if the evidence could allow a reasonable jury to return a verdict for the non-moving party. *See id.*

## DISCUSSION

### A. Constitutionality of Waste Designation.

The Constitution bestows unto Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8, cl. 3. Implicit in this power is a concomitant restriction on the ability of the States to regulate interstate commerce when Congress has not explicitly authorized such action. *See Associated Indus. of Missouri v. Lohman*, 511 U.S. 641, 646–47, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994). Although this "dormant Commerce Clause" is "one of the great silences of the Constitution," *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 535, 69 S.Ct. 657, 93 L.Ed. 865 (1949), it is also a venerable principle of constitutional law. As Justice Jackson stated in *H.P. Hood & Sons:*

[t]his principle that our economic unit is the Nation, which alone has the gamut

of powers necessary to control the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units ... [W]hat is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.

This provision may be among the most important in the Constitution, for it addressed what many perceived as the central vice of the Articles of Confederation. "The few simple words of the Commerce Clause ... reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies towards economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *see also* Albert F. Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L.Rev. 432, 442–46 (1941).

■ A State or municipal law may violate the Commerce Clause in either of two ways. First, if the ordinance facially "discriminates against interstate commerce," *see Carbone*, 511 U.S. at 390, 114 S.Ct. 1677; or second, if the ordinance "imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *See id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Randy's claims that the Ordinance in its interstate form facially discriminated against interstate commerce, and that the Ordinance in its intrastate form imposed an excessive burden on interstate commerce under *Pike*.

1. *Constitutionality of Interstate Designation.* As an initial-albeit very important-matter, the County argues that Randy's cannot challenge the constitutionality of the Ordinance in its interstate form because such a claim is barred by the applicable statute of limitations. According to the County, Randy's' claim accrued on the date the Ordinance was passed-February 18, 1992. Because Randy's did not file its Complaint until April 20, 1998, the County argues that the claim was not timely brought within the six-year statute of limitations applicable to § 1983 actions in Minnesota. *See Ben Oehrleins & Sons & Daughter v. Hennepin County*, 867 F.Supp. 1430, 1437 (D.Minn.1994). In opposition, Randy's asserts that its claim accrued-and the clock thus began running-when the Ordinance actually took effect, which was April 20, 1992. Because it filed its claim six years to the day of the Ordinance's effective date, Randy's argues its claim was timely.

■ Because § 1983 does not contain an explicit statute of limitations, the Court "borrows" the limitations period from the forum state's most similar statute. *See Egerdahl v. Hibbing Comm. College*, 72 F.3d 615, 618 (8th Cir.1995). This same borrowing rule, though, does not necessarily apply to determining when a claim under § 1983 accrues. The circuits which have addressed the issue have uniformly concluded that although state law provides the statute of limitations for a § 1983 claim, federal law defines the date at which the cause of action accrues. *See, e.g., Rivera–Ramos v. Cesar Roman*, 156 F.3d 276, 282 (1st Cir.1998).[1] This Circuit has done so in an unpublished opinion, *see White v. Garrison*, 70 F.3d 1276, 1995 WL 704321, *1 (8th Cir.1995), and has adopted a similar rule in reference to cases arising under ERISA. *See, e.g., Bennett v. Federated

---

1. *See also Covington v. City of New York*, 171 F.3d 117, 121 (2d Cir.1999); *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir.1995); *Burns v. Harris County Bail Bond Board*, 139 F.3d 513, 518 (5th Cir.1998); *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir.1996); *Sellars v. Perry*, 80 F.3d 243, 245 (6th Cir.1996); *Cabrera v. City of Huntington*, 159 F.3d 374, 379 (9th Cir. 1998); *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir.1998); *Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir.1996).

*Mut. Ins. Co.*, 141 F.3d 837, 838 (8th Cir. 1998). On the basis of this authority, the Court determines that federal law, not state law, provides the basis for determining when Randy's' claim accrued.

Neither federal nor state law, however, really provides any guidance on claim accrual in these circumstances. Neither the parties nor the Court have identified any precedent directly on point. That is, there are almost no reported cases in which a court has had to decide between the passage date and the effective date of a statute as the relevant threshold for determining when a challenge to a statute accrues. This judicial silence is easily explainable. This case presents an extremely unusual situation. Ordinarily, a party aggrieved by an allegedly infirm statute files suit soon after its implementation. Very rarely would the plaintiff wait until long after the statute takes effect, as here, to raise a challenge.

■ As a result, this Court must construct a rule for determining when a claim accrues in these circumstances. As a general rule, a claim does not accrue until the plaintiff has "a complete and present cause of action." *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California*, 522 U.S. 192, 118 S.Ct. 542, 549, 139 L.Ed.2d 553 (1997); *Clark v. Iowa City*, 87 U.S. (20 Wall.) 583, 589, 22 L.Ed. 427 (1874) ("All statutes of limitations begin to run when the right of action is complete."). A "complete and present cause of action" exists when all the elements which comprise a claim have arisen. The Supreme Court has identified three elements central to a claim under § 1983:(1) the conduct complained of was committed by a person acting under color of state law; (2) the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or federal law; and (3) the plaintiff suffered an "actual, compensable injury." *See Memphis Comm. School Dist. v. Stachura*, 477 U.S. 299, 308, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Thomas v. Gunter*, 32 F.3d 1258, 1259 (8th Cir.1994).

■ In this case, there is no doubt that Wright County and the individual named Defendants acted under color of state law and are appropriate parties for suit under § 1983. *Cf. Monell v. Dep't of Social Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The real questions turn on when the Defendants deprived Randy's of its constitutional rights, and when Randy's suffered an actual injury. The answers to these questions lead to the inescapable conclusion that Randy's' claim accrued when the Ordinance took effect, not when it was passed. Between February 18 and April 19, 1992, the Ordinance did nothing to directly harm Randy's. It was still able to ship waste to any location, either within or without Minnesota. In addition, there is no evidence that Randy's incurred any costs preparing for the new designation regime. The County attaches some significance to Randy's' purchase of a scale in February 1992, apparently one of a sort typically used to comply with designation requirements. However, Randy's points out that the scale was actually purchased to comply with designation requirements in other jurisdictions; the assertion is buttressed by the fact that the scale was purchased before the Ordinance was even *passed.* Because there was no expenditure, there cannot have been any injury.

The County points to a few cases which apparently state the rule that facial challenges to ordinances accrue "the moment the challenged regulation or ordinance is passed." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). *See also Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 34 F.3d 753, 755 (9th Cir.1994). However, these cases involve challenges to statutes under the Takings Clause. It stands to reason that a regulation that could substantially strip property of its value injures the aggrieved party the moment it is passed, for the market is immediately aware that the property will imminently be valueless. If Randy's were somehow bringing a takings claim here, the result might be different.

However, because the Plaintiff's claim complains of a violation of the Dormant Commerce Clause under § 1983, Randy's claim is timely.

■ We now turn to the merits of Randy's' argument regarding the constitutionality of the Ordinance in its interstate form. Based on the Supreme Court's decision in *Carbone*, it is easy to conclude that the waste designation ordinance from April 20, 1992 to April 20, 1993, violated the Dormant Commerce Clause because it consciously discriminated against interstate commerce.[2] In *Carbone*, the town of Clarkstown, New York, constructed a solid waste transfer station with the aid of a local contractor. The contractor agreed to pay for the facility, provided that the town guaranteed the facility a minimum flow of 120,000 tons of garbage per year, with a tipping fee of $81 per ton. After five years, the town was to purchase the facility for $1. In order to guarantee the facility the minimum flow required, Clarkstown adopted a flow control ordinance, which required all solid waste generated in Clarkstown to be processed at the transfer station.

After the New York state courts upheld the constitutionality of Clarkstown's ordinance, the Supreme Court judged the ordinance unconstitutional as a facially discriminatory attempt to limit interstate commerce. According to the Court, the Clarkstown ordinance was no different than a number of other "local processing requirements" long held invalid. *See, e.g., South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (holding unconstitutional an Alaska regulation that required all timber cut in the state to be processed there before export). "The flow control ordinance ... hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility ... [I]t squelches competition in the waste-processing service altogether, leaving no room for investment from outside." *Carbone,* 511 U.S. at 392, 114 S.Ct. 1677. Rather than limiting the flow of waste, Clarkstown should have financed its facility through taxes or municipal bonds. *See id.* at 394, 114 S.Ct. 1677.

Obviously, the fact pattern recited above should sound familiar-it is identical to the circumstances surrounding the adoption of Wright County's designation ordinance in 1992. As a result, it is clear that *Carbone* represents controlling precedent. Just like the ordinance in question there, the Wright County measure was a "special financing" measure which should have been pursued from the outset through more traditional means of public finance, such as general taxes or municipal bonds. "[H]aving elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State." *Id.*

The Eighth Circuit's decision in *Ben Oehrleins & Sons & Daughter v. Hennepin Cty.,* 115 F.3d 1372, 1384–85 (8th Cir. 1997), further compels the conclusion that interstate waste designation was unconstitutional. *Oehrleins* involved Hennepin County's "Ordinance 12," which required all specified forms of waste generated

2. Although the majority in *Carbone* deemed the processing ordinance in that case a blatant discrimination against interstate commerce, Justice O'Connor, concurring in the judgment, viewed the restriction instead as an "evenhanded" regulation which should instead be analyzed under the *Pike* test. Unlike the litany of "local processing regulation" cases the majority recited in its opinion, the Clarkstown flow control ordinance lacked a conscious bias against outsiders. Instead, the ordinance discriminated against *everyone,* regardless of their location, in favor of the municipal facility. However, even under the *Pike* test, Justice O'Connor concluded that the Clarkstown ordinance violated the Dormant Commerce Clause, because it imposed such great burdens on interstate commerce. Justice O'Connor's approach addresses the issue better than that of the majority. However, because a majority of the Justices concluded that a statute extremely similar to Wright County's ordinance blatantly discriminated against interstate commerce, this Court feels constrained to forego the *Pike* test.

within the County to be taken to a county-owned waste processing facility (the "HERC") in order to be converted into electricity. Unlike the Wright County ordinance in question here, Ordinance 12 actually allowed for the further designation of other facilities besides the HERC. Despite this loophole, the Eighth Circuit concluded that Ordinance 12 violated the Dormant Commerce Clause:

> Ordinance 12 was enacted, in part, specifically to insure an adequate waste supply for a certain designated facility: the HERC incinerator. Indeed, the HERC plant was the only facility the only disposal facility the Ordinance initially designated ... The possibility of an out-of-state processor obtaining designation or getting a later exclusion simply does not alter the initial immediate purpose and effect of the Ordinance, which was to grant an absolute preference to a particular local interest at the expense of all others. The district court rightly concluded that, as applied to waste destined for transport outside Minnesota, Ordinance 12 discriminates against interstate commerce and is thus subject to rigorous scrutiny. In light of *Carbone* and *Waste Systems* we hold that the interstate enforcement of the Ordinance cannot survive such scrutiny and violates the Commerce Clause.

*Oehrleins*, 115 F.3d at 1385. The lesson of *Oehrleins*, like that of *Carbone*, is clear: when a locality enacts a law that explicitly favors a local enterprise over outsiders, that law consciously violates the Dormant Commerce Clause.

According to the County, though, the battle over interstate designation is not won or lost on the basis of *Carbone* and *Oehrleins* alone; it raises a consideration which, it argues, warrants distinguishing Randy's' claim here from *Carbone* and *Oehrleins*. The County argues (in essence) that Randy's lacks standing to challenge interstate designation because it was not transporting waste from Wright County out-of-state when the Ordinance was in its interstate form. Essentially, the County claims, Randy's is bringing a claim on behalf of other waste haulers who were involved in the interstate transportation of waste prior to designation. (*See* Def.'s Mem. in Opp. at 6–7.) Randy's, in opposition, simply asks the Court to look to the express holding of "*Oehrleins* and the result in ever other designation case." (Pl.'s Reply Mem. at 1.)

*Oehrleins* is, in fact, very instructional on the issue of standing. Or, more precisely, its silence is extremely instructional. In that case, the court did not differentiate between each waste hauler's standing to challenge interstate designation and intrastate designation. In fact, it did not even mention whether any particular plaintiff was involved merely in intrastate hauling, or extended its enterprises to interstate transport. *See Oehrleins*, 115 F.3d at 1379 ("There is no question that the *Oehrleins* plaintiffs, that is, various waste haulers and processors, have standing.").

▮▮▮ The County argues that the Eighth Circuit did not consider plaintiffs' standing to challenge interstate designation because that issue was not appealed from the district court. (*See* Def.'s Mem. in Opp. at 8 n. 6.) However, Randy's aptly notes that standing is jurisdictional. A federal court bears the burden of examining standing at all stages of litigation, even if the parties do not raise the issue themselves. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752 (1982). Accordingly, the *Oehrleins* court must have been satisfied that each plaintiff had standing to challenge a restriction on out-of-state transportation of waste, regardless of whether it actively engaged in the activity or not. *See also Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir.1999) (the plaintiff's "claim to standing is not damages because he failed to allege that he hauled garbage out-of-state or planned to do so") (citing *Oehrleins* ).

On the basis of the discussion above, the Court enters judgment in favor of Randy's on Count I of the Complaint. However,

the Court declines at this time to determine the damages to which Randy's is entitled. In its memoranda to the Court, Randy's asks for damages in the amount of $134,097, a figure which it calculates by multiplying the difference between the Ordinance's established tip fee and prevailing market rates in 1992 and 1993 by the amount of relevant waste Randy's hauled during the period of interstate designation. Admittedly, this simple mathematical model seems attractive. But its very simplicity speaks to its possible inappropriateness as a model for damages. At least two factors weigh into the Court's reluctance to grant Randy's the damages it seeks at this time. First, the County's expert, Daniel Gorowsky, disputes this figure, in part because it may be based on incorrect "gate rates." Second, there is some lingering concern over the appropriateness of the "pass-through" defense. If it is applicable-and there has been no determination made that it is-the extent to which Randy's passed through its expenses to its customers must be demonstrated. Because the consideration of whether the pass-through defense applies is better dealt with at a damages hearing, the Court postpones treatment of this subject until that time.

2. *Constitutionality of Intrastate Designation.*

 The constitutionality of the Ordinance in its intrastate form, however, is a much closer question. There is no doubt, and no dispute, that the balancing test established by *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), is the applicable standard by which to test the constitutionality of the Ordinance in its intrastate form. When a state law does not consciously discriminate on its face against interstate commerce, but instead merely imposes a possibly unconstitutional burden thereon, the *Pike* test applies. *See, e.g., Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Edgar v. MITE Corp.,*

457 U.S. 624, 643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Cotto Waxo Co. v. Williams,* 46 F.3d 790, 794 (8th Cir.1995). Under *Pike,* intrastate designation is unconstitutional only if "the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844; *Oehrleins,* 115 F.3d at 1387. The precise factors which this Court must consider are often inexactly expressed. A survey of *Pike* and other cases applying the standard enunciated therein sets forth five factors which must be balanced against each other:

(1) the putative benefits of the challenged ordinance;

(2) the nature of the interest involved;

(3) the burdens on interstate commerce caused by the ordinance;

(4) whether the burdens are clearly excessive in relation to the benefits; and

(5) whether the State's interests could be promoted as well with a lesser burden on interstate commerce.

*See, e.g., Pike,* 397 U.S. at 147, 90 S.Ct. 844; *Nat'l Ass'n of Fundraising Ticket Manufacturers v. Humphrey,* 753 F.Supp. 1465, 1475 (D.Minn.1990).

The County disputes the separate consideration of the first and second factors. It argues that deference must be paid to legislative goals; whether these goals are actually met is largely irrelevant. However, as Judge Rosenbaum of this Court made clear in *APL Ltd. Partnership v. Van Dusen Air, Inc.,* 622 F.Supp. 1216, 1221 (D.Minn.1985), the County's "interests" in the Ordinance and the "benefits" it actually enjoys must be analyzed separately if a Dormant Commerce Clause analysis is to have any integrity.[3]

A state may have a legitimate desire to accomplish a certain objective. That desire represents an interest of the state. However, to the extent that a statute which burdens interstate commerce fails

**3.** Although the Eighth Circuit later vacated Judge Rosenbaum's decision, that action did

nothing to weaken the force of the reasoning contained therein.

to further the state's desired result, that statute will not result in any local benefits to a state. Under the Supreme Court's decisions applying the Commerce Clause, the state of Minnesota may not prevail by simply demonstrating that its statute was designed to further a legitimate state interest. It must also demonstrate that its legitimate interest will, in fact, be served by the statute ... A Commerce Clause analysis which required this Court to assume that the state's interest would be advanced by a statute would mean that only in those rare cases where the state artlessly failed to set forth laudable interests could a court strike down a statute as a violation of the Commerce Clause. This court has the constitutional duty to determine whether State-desired benefits can, in fact, result from the statute and only those which are not "speculative" may be placed in the scale to be balanced against the burden on interstate commerce.

*Id.* at 1221. Despite some language to the contrary, the Supreme Court has consistently held that the actual benefits a statute or regulation leads to must be scrutinized. *See Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 666, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). To do otherwise would lead to a nonsensical *Pike* situation in which predicted benefits would be balanced against actual burdens. Accordingly, the benefits Wright County actually realized will be considered separate from the benefits it hoped to realize.

A. *The County's Putative Interests in Intrastate Designation.* Obviously, Wright County has a legitimate interest in the Ordinance. Almost every governmental action is prompted by a worthy goal. Although the Ordinance itself does not recite any specific purposes, the Wright County Waste Designation Plan ("WCWDP") that undergirds the Ordinance does. Specifically, the County hoped the Facility would (1) further Minnesota's environmental policies; (2) allow the County to recapture 25 tons of recyclable materials each day; (3) gener-

ate 84 tons of compost each day; (4) convert for reuse almost three-quarters of waste otherwise headed for landfills; (5) enable the County to market compost in order to fund the Facility; and (6) pass costs through to waste generators, thus motivating them to recycle and generate less waste in general. Randy's expert, Dr. Mark Berkman, examined the relevant statutes and generally identified the same six goals. (*See* Berkman Rpt. at 5–14.)

B. *The County's Benefits From Intrastate Designation.* Clearly, the goals recited above are worthy ones, and for the most part, appropriate considerations for the County to bear in mind when deciding on local initiatives. However, the uncontested record underlying these motions demonstrates that intrastate designation did not lead to the realization of these benefits. Specifically:

1. The compost generated by the Facility usually did not meet state standards, and largely ended up in landfills as it would have had the Facility not opened. The compost that was usable was simply given away, at a cost to the County. (*See* Berkman Rpt. at 6–8.)

2. The Facility was not successful in separating marketable recyclable materials out for sale. According to Berkman's report, only 3% of the incoming waste was recyclable, and the cost of separation actually outpaced any revenues the County enjoyed from the sale of recyclables. (*See id.*)

3. The County's goal of reducing waste generation by increasing the price waste generators had to pay for disposal was undercut by an increase in the illegal burning of waste and other illegal methods of disposal. (*See id.*)

Based on these facts, it is obvious why the County urges the Court to examine the benefits the County hoped to achieve through the Ordinance and its Facility, rather than those which actually came to pass. The Facility, and intrastate designation, were failures.

*C. Burdens on Interstate Commerce.* In this case, this factor is the most disputed of the five which form the core of the *Pike* analysis. Some courts, without the benefit of a developed record, have suggested that intrastate designation may actually promote interstate commerce because designation often presents local haulers with incentives to transport waste out of state. *See, e.g., Oehrleins,* 115 F.3d at 1385. However, as Berkman's report points out, intrastate designation is, in the long run, highly inefficient. If several jurisdictions were to adopt intrastate designation, the interstate market for waste disposal would quickly dry up. Out-of-state facilities will often be cheaper than in-state facilities, particularly those in areas marked by free trade in waste; as a result, out-of-state facilities would quickly reach their maximum capacities. Because the opening of new landfills is politically unpopular-especially landfills which would serve only out-of-state interests-over the long run out-of-state placement would become unavailable. This would obviously inflict a severe burden on interstate commerce. (*See* Berkman Rpt. at 12.)

The County's expert does not contradict this analysis. However, the County contends that this sort of reasoning, in which the Court is asked to consider interstate effects if several jurisdictions adopted similar policies, is improper. Although the County recognizes that this form of analysis is present in Dormant Commerce Clause jurisprudence, it contends that it is properly confined to "a different branch of the doctrine, involving the appropriate extraterritorial reach of state laws." (Def.'s Mem. in Opp. at 13.) *See, e.g., Brown–Forman Distillers Corp.,* 476 U.S. at 579, 106 S.Ct. 2080 (1986). However, the County cannot identify any case in which this type of analysis has been specifically rejected in a case *not* involving extraterritoriality. For example, the County notes that the Eight Circuit in *Oehrleins* did not utilize this approach in its analysis of Hennepin County's designation ordinance. In that case, however, the court did not have to address the issue, for it merely remanded the case to the District Court for an application of the *Pike* test after determining that the District Court had applied the wrong standard.

 Absent precedent to the contrary, this Court sees no reason why Randy's should not be allowed to base its argument about economic burdens on a hypothetical extension of intrastate designation to other jurisdictions. Quite often, the economic benefits a small community would enjoy from enacting a law that affects interstate commerce will far outstrip the burdens it imposes on such commerce, because a minor locality's laws will likely have no more effect on interstate commerce than a twig would disrupt a river. Failing to adopt an aggregate analysis would render possible the situation in which numerous localities enacted such laws. Analyzed individually, the burden of each specific law would be very small. Taken together, however, these twigs would become a dam, crippling the interstate flow of commerce. In order to ensure that such laws are not adopted, the aggregate analysis urged by Randy's must be adopted.

*D. Burdens Balanced Against Benefits.* When the almost nonexistent benefits the County enjoyed are balanced against the burdens intrastate designation could place on interstate commerce, it is clear that the burdens on interstate commerce, far-sighted as they may be, outstrip the minimal benefits the County enjoyed from designation.

*E. Less Burdensome Alternatives.* Ultimately, this final consideration may be the proverbial nail in the coffin for intrastate designation. It is clear that the County could have ensured the viability of the Facility and thus promoted its interests through less restrictive means than requiring all waste that remained inside Minnesota to be processed at the Facility. Primarily, the Facility could have been supported-and the County's interests thus furthered-by funding it through either a tax increase or through a special bond issue. In fact, the Supreme Court in *Car-*

*bone* noted the Town of Clarkstown should have financed its waste facility though such measures, rather than a flow control ordinance. Here, it is obvious that these means were available to Wright County, because it ultimately did finance the Facility through an increase in property taxes. That option was actually preferred by Wright County Environmental Health Officer Chuck Davis from the outset. (*See* Davis Dep. at 476.) Davis also acknowledged that if the County was going to fund the Facility from revenues on the waste it processed, contracting with waste haulers was a viable option.

■ Based on the analysis of the foregoing five factors, the Court concludes that intrastate designation violated the Dormant Commerce Clause. Most significantly, intrastate designation did little to benefit Wright County. In addition, the County had less-restrictive means at its disposal to ensure the Facility's viability and promote the goals it wished to achieve. When balanced against the probable burden on interstate commerce intrastate designation posed, the County's regime of intrastate designation fails the *Pike* test.

The Eighth Circuit's recent opinion in *United Waste Systems of Iowa, Inc. v. Wilson*, 189 F.3d 762 (8th Cir.1999), does nothing to weaken the analysis presented above. At issue in *United Waste Systems* was Iowa's solid waste disposal program. Under Iowa law, each county was to designate a specific in-state facility to which all its waste would be sent, unless it was shipped out of state. In contrast to the case currently before the Court, the Iowa statute did not force a county to keep all waste within its borders; instead, the county could designate a facility anywhere within the state. A waste facility and a hauler which brought waste thereto challenged the law as a violation of the Dormant Commerce Clause after it suffered a loss of business as a result of the in-state designation program.

The Eighth Circuit concluded that the Iowa scheme passed the *Pike* test. What-ever loss of business the two plaintiffs suffered was not the result of a pinch on interstate commerce, but rather "their failure to persuade the cities and counties of Iowa to do business with them and to designate Central Disposal's landfill in the comprehensive plans." *Id.*, at 766. The court repeatedly noted the fact an Iowa county was free to designate any facility anywhere within the state for disposal *See id.* ("cities and counties of Iowa are completely free to contract with United Waste and Central Disposal in the same manner that they may contract with any other provider of services"); *id.* at 766 ("the State of Iowa does not force cities and counties to contract with a particular landfill"); *id.* at 766 ("cities and counties in Iowa are free to renegotiate their landfill contracts and alter their comprehensive plans to designate a different landfill"). Because of the fluidity and choice offered by Iowa's designation regime, any burdens on interstate commerce were only "incidental." *See id.* at 767.

*United Waste Systems* is easily distinguishable from the present case. Here, Randy's has presented essentially unrebutted evidence of a significant burden on interstate commerce. In *United Waste Systems*, the plaintiffs produced almost no evidence of any burden, thus making summary judgment against them appropriate. Even if this were not the case, however, the specifics of Iowa's and Wright County's designation programs had much different effects on interstate commerce. Randy's and other Wright County waste haulers are in a much different position than the plaintiffs in *United Waste Systems*. Under the Iowa designation program, waste facilities and waste haulers-including those based out-of-county-were free to negotiate with counties and secure their business. As a result, the free market was largely intact. In Wright County, by contrast, waste had to remain with the County unless shipped out of state, thus leading to local inefficiencies and the restraint on interstate commerce described above.

Accordingly, the Court enters judgment for Randy's on this part of its Complaint.

### B. Denial of Transfer Station Permits.

Randy's next argues that the County's denial of its re-zoning request and its application for a conditional use permit violated the Dormant Commerce Clause as well. Essentially, it argues that the County's refusals to grant Randy's the zoning relief it sought manifests a clear discriminatory intent against interstate commerce; at the very least, the County's actions had the effect of discriminating against interstate commerce, rendering the denials similarly unconstitutional. In opposition, the County maintains that Randy's has not produced sufficient evidence that the County's decisionmakers were motivated by wrongful considerations.

■■■ Randy's arguments here need not be given thorough consideration, for it is clear that its claim is not ready for summary judgment. In order to prevail, Randy's must prove that the County's decisionmakers were motivated by a desire to stifle interstate commerce, and that the same decision would not have been made absent this wrongful motivation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Although the record supporting these motions is replete with evidence which could point to wrongful motivations on the part of County officials, this evidence is not conclusive. The determination of motivation, like credibility, is a matter left to the trier of fact.

Nor will the Court now analyze the effects of the County's zoning decisions and pass judgment on whether such actions violated the Dormant Commerce Clause. Zoning is a matter of particular importance to state and local governments. *See Night Clubs, Inc. v. City of Ft. Smith,* 163 F.3d 475, 479 (8th Cir.1998). As a result, federal courts have traditionally been somewhat hesitant to interfere in the zoning process. That concern is particularly present here. Randy's asks this Court, on the basis of two zoning decisions, to declare that those decisions had the "effect of discriminating against interstate commerce." Those decisions may have had such an effect, but no more so than would any commonplace zoning decision preventing a distributer from building a distribution warehouse in a residential zone. In short, the County's actions cannot be deemed wrongful in this regard without a consideration of motive-a factor which must be determined at trial. Accordingly, the Court will not enter summary judgment for either party on this Count of Randy's Complaint.

### C. Substantive Due Process.

In Count II of its Complaint, Randy's complains that the County violated its rights under the substantive due process provisions of the Fourteenth Amendment by "engag[ing] in a series of retaliatory actions against Randy's Sanitation, including the unjustified denial of requested permits, and attempts to persuade other public and private entities not to contract with or otherwise do business with Randy's Sanitation" in response to Randy's' challenges to the Ordinance. (Compl.¶¶ 37–39.) The County argues that Randy's' claim must be dismissed, because it has failed to identify a deprivation of "life, liberty or property" protected by due process. (*See* Def.'s Mem. in Supp. at 23.) Randy's, in contraposition, contends that it has, in fact, identified such a right: the arbitrary denial of a conditional use permit application. (*See* Pl.'s Mem. in Opp. at 32.)

It should be stated from the outset that, for Randy's to succeed on its claim, it must swim upstream against a current increasingly hostile to substantive due process claims arising from zoning decisions. This is especially true in the Eighth Circuit. In *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102 (8th Cir.1992), the Eighth Circuit rejected a substantive due process claim brought by a developer against a city for enforcing illegitimate

zoning ordinances against it. The ordinances were unlawful because they had not been properly filed with the Recorder of Deeds as required by state law. The city was not aware of this shortcoming, and enforced the zoning ordinance against the plaintiff. *Id.*

The *Chesterfield* court rejected the propriety of a claim in these circumstances. "[I]n zoning and land-use disputes with local governments, the plaintiff must allege something more than that the government decision was arbitrary, capricious, or in violation of state law. Such claims ... are better addressed to state courts and administrative bodies. Otherwise, every violation of state law could be turned into a federal constitutional tort." *Id.* at 1104 (citing *Lemke v. Cass County, Nebraska,* 846 F.2d 469, 470–71 (8th Cir.1987) (en banc)). In order to state a substantive due process claim, the plaintiff must state that the zoning decision was "truly irrational," such as "attempting to apply a zoning ordinance only to persons whose names begin with a letter in the first half of the alphabet." *Id.* Importantly, the court also stated that "[o]ur decision would be the same even if the City had knowingly enforced the invalid zoning ordinance in bad faith." *Id.* at 1105. The *Chesterfield* court's last statement was prescient, for in *Bituminous Materials, Inc. v. Rice County,* 126 F.3d 1068, 1070–71 (8th Cir.1997), the Eighth Circuit determined that even a zoning decision motivated by personal ill will towards the plaintiff cannot give rise to a substantive due process claim. "It would be inconsistent with the high threshold we established in *Chesterfield* to hold that a substantive due process claimant will survive summary judgment by alleging that a land use planning decisionmaker does not like the plaintiff." *Id.* at 1071.

The *Bituminous Materials* court, however, left open a small group of cases which could state a claim under the Due Process Clause. "We acknowledge that there may be cases where land use decisions are so corrupted by the personal motives of local government officials that due process rights are implicated." *Id.* It

is into this category that Randy's claims the County's action falls. For support, Randy's raises a case noted by the court in *Bituminous Materials: Wilkerson v. Johnson,* 699 F.2d 325, 328–29 (6th Cir. 1983). In *Wilkerson,* the Sixth Circuit held that a plaintiff who alleged that a decisionmaker's determination that plaintiff did not qualify for a barbershop license was motivated solely by the decisionmaker's concern for the profitability of his own competing barbershop. In short, the decisionmaker was using the licensing process to protect himself against competition, thus undermining the entire notion of fair governance. Randy's essentially contends that the County's actions here mirror those in *Wilkerson,* for the County allegedly used the zoning process to protect the Facility against competition.

■■■ On the face of the matter, Randy's' comparison of its case to *Wilkerson* is persuasive. When the state or a state actor acts in such a way as to abuse its laws and place itself at a competitive advantage over others, due process rights may be implicated. However, Randy's has not sufficiently identified a sufficiently concrete "interest" protected by due process. Presumably, Randy's' entitlement is that described by the Eighth Circuit in *Bituminous Materials:* "a claim to entitlement arises ... when a statute or regulation places substantial limits on the government's exercise of its licensing discretion." *Bituminous Materials,* 126 F.3d at 1070. This is a very restrictive standard:

> State laws and regulations create a protectable ... interest only when they (1) "place substantive limitations on the exercise of official discretion;" and (2) contain "explicit mandatory language" comprising "specific directives to the decision maker that if the regulations"' substantive predicate acts are met, a particular outcome must follow.

*Hyland v. Metropolitan Airport Comm'n,* 884 F.Supp. 334, 337 (D.Minn.1995) (quoting *Williams v. Nix,* 1 F.3d 712, 717 (8th Cir.1993)). In *Wilkerson,* the plaintiff was

able to state a claim because the barbershop license would issue, as a matter of law, upon the satisfaction of certain conditions. Here, Randy's is in a much weaker position, for the zoning decisions about which it complains are more discretionary in nature. Only if the regulations upon which it was relying were mandatory in nature could Randy's now maintain a substantive due process claim. As a result, the Court dismisses Count II of Randy's Complaint.

### D. Tortious Interference With Contract.

Finally, the County moves for summary judgment on Randy's' tortious interference claims. The County asserts that Randy's' claims are time-barred by the two-year statute of limitations applicable to tortious interference claims predicated on defamatory activity under Minnesota law. *See Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 793 (1975). Randy's acknowledges this limitations period, but contends that it is simply not applicable here because of the substance of its claims.

As a general matter, the statute of limitations for a tortious interference with contract claim in Minnesota is six years. *See* Minn.Stat. § 541.05. However, where a tortious interference claim is predicated on "defamatory" activity, the two-year statute of limitations applicable to libel or slander claims applies. *See* Minn.Stat. § 541.07(1); *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 793 (1975); *McGaa v. Glumack*, 441 N.W.2d 823, 826 (Minn.App.1989). The task in this case, then, is to identify the allegedly tortious activity about which Randy's complains.

In its Complaint, Randy's brings three separate claims of tortious interference against, respectively, Wright County, Sawatzke, and Jude. Two basic acts give rise to these claims. First, Randy's alleges that the Defendants threatened to withhold County business and state subsidies from entities which did business with Randy's. (*See* Pl.'s Motion in Opp. at 30; Drysdale Aff. Ex. T,U.) Second, Randy's also contends that the Defendants misrep-

resented the legal liability for contracting with Randy's to those who attempted to do so. Based on these claims, it is clear that these actions allegedly taken by the Defendants were "defamatory" in no sense of the word. Accordingly, Randy's' claims are not time-barred under the applicable six-year statute of limitations.

The County also argues that its statements to others are activity protected by the First Amendment, expressed through the "petitioning immunity" doctrine first expressed in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)-the so-called *Noerr–Pennington* doctrine. The *Noerr–Pennington* doctrine protects parties from civil liability for actions undertaken in a good-faith effort to secure a legislative or adjudicative result. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511–16, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Although first developed in the context of antitrust law, "this deference to the right to petition applies not only in antitrust cases but in other cases involving civil liability." *Gorman Towers v. Bogoslavsky*, 626 F.2d 607, 614–15 (8th Cir.1980).

The County's *Noerr–Pennington* defense, like any defense raised in a pretrial pleading, may ultimately prove successful. However, at this point, material disputes of fact which prevent the doctrine from shielding Defendants from liability. Two things remain to be established at trial: the precise nature and scope of the Defendants' activity, and the mindset under which they operated. Only if the trier of fact determines that the County and its agents were acting in a good-faith effort to secure a valid legislative outcome can the County avail itself of *Noerr–Pennington.*

### CONCLUSION

Wright County's attempts to insulate its Facility from competition violated the

Dormant Commerce Clause-both by prohibiting the interstate shipment of waste collected within the County, and by forbidding the export of waste to other counties within Minnesota. The Dormant Commerce Clause prohibits local governments from interfering in the orderly flow of interstate commerce by enacting regulations which favor local enterprises over others. That outcome was both the intent and the effect of the County's Ordinance. However, Randy's has not sufficiently pled a substantive due process claim against the County for its denials of relevant permits.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment as to the Illegality of Designation and Damages of $134,097 (Clerk Doc. No. 32) is GRANTED IN PART and DENIED IN PART;

2. Plaintiff's Motion for Summary Judgment as to Liability for Transfer Station Permit Denials (Clerk Doc. No. 29) is DENIED;

3. Defendants' Motion for Summary Judgment (Clerk Doc. No. 39) is GRANTED IN PART and DENIED IN PART;

4. Judgment is entered for Plaintiff on those parts of Count I of Plaintiff's Complaint (Clerk Doc. No. 1) which complain of Wright County's interstate and intrastate designation of waste;

5. Count II of the Complaint is DISMISSED WITH PREJUDICE.