ALICE M. BATCHELDER, Chief Judge,
dissenting.
Because I believe that the majority opinion does not adequately account for the First Amendment implications of this case and conflates the exhaustion of administrative remedies with the obtaining of a final decision, I respectfully dissent.
This case revolves around Jennifer Frey’s intensity determination, not, as Northville frames it, the possible end result of the larger zoning process. The two are in fact distinct, and Miles Christi’s claims arise from Frey’s decision. Miles Christi was thrust into the current controversy, not because of any actions it initiated, but solely because of actions initiated by state officials. Frey, acting pursuant to her authority as Director of Community Development, determined that Miles Christi had intensified the use of its property; yet Miles Christi was merely using its property exactly as it always had. Frey’s decision immediately harmed Miles Christi’s First Amendment rights, and that harm cannot be undone by any retrospective relief that Miles Christi might obtain from the Zoning Board of Appeals (“ZBA”).
Because Miles Christi suffered a First Amendment harm, this case is not a run-of-the-mill takings clause case. Takings clause cases, though applicable, cannot fully address the issues presented here because the First Amendment triggers concerns unaccounted for by the traditional takings clause analysis.
Further, any relief that the ZBA may ultimately provide does not impact the finality of Frey’s intensity determination. The line between exhausting administrative remedies and obtaining a final decision is often obscure, but the two concepts are distinct. Everything that happened to Miles Christi is a result of Frey’s decision. That decision was final and had an immediate, harmful effect. Any relief that the ZBA may provide is merely an administrative remedy, and its availability has no bearing on the finality of Frey’s intensity determination.
I.
A review of the record below clearly demonstrates that it was Frey’s decision that placed Miles Christi in its current position. Miles Christi is an international Catholic religious order. Since 2002, this particular community has resided in a single-family home in Northville. Also since 2002, Miles Christi has continuously used its home for private daily masses and Bible studies. From 2002 until the events in 2007 giving rise to this litigation, Miles Christi’s use of its property remained unchanged.
*543 As the majority opinion indicates, Fr. Bertolacci met with various township officials in March 2007 to discuss the parking problem. At the meeting, Frey stated that she had determined that Miles Christi’s use of the property had become more intensive — that the use had changed from that of a single family residence to a more intensive non-residential use. She explained that the use now resembled a small church or place of worship. Accordingly, she insisted that Miles Christi would have to go through the town’s site review process, beginning by submitting a site plan, to ensure there were sufficient parking and landscaping buffers, along with other requirements. See Northville Code of Ordinances §§ 170-26.2, 170-26.3. Fr. Bertolacci protested this decision.
Miles Christi hired an engineering firm to estimate the cost of compliance with the ordinances. That review cost about $5,000. The firm estimated the compliance cost at around $80,000, along with the cost of completing and submitting the site plan itself, which could cost an additional $30,000.
Miles Christi did not submit the site plan on the required date, and Bauer issued a civil infraction ticket to the Order on June 5, 2007. Issuance of the ticket commenced legal proceedings in state court to enforce Northville’s requirement that Miles Christi submit a site plan. The ticket required Miles Christi to appear in state district court on June 20, 2007, and carried the potential penalty of a sizable fine.
Miles Christi did not pursue any administrative appeals with the Zoning Board of Appeals (“ZBA”) or seek a variance, but instead challenged the ticket in the state court proceeding that Northville had initiated. The Michigan district court dismissed the case, ruling that the regulation was overly vague and subjective because it contained no standard by which to judge what constituted a “more intensive use” of the property. Northville appealed, and the state circuit court reversed and remanded. On remand, the parties agreed to hold the case in abeyance pending the results of this federal litigation.
Miles Christi claims that as a result of the ticket and the threat of future enforcement — including a threat to ticket attendant vehicles if there were too many or if any were parked on the grass — it has refrained from asking friends to join it for religious or other social activities. The Order has continued to celebrate Mass in the oratory and does have on its website a notice for continuing Bible studies and religious activities.
Plaintiffs filed this suit on September 21, 2007, in federal district court raising claims under 42 U.S.C. § 1983 for violation of their First Amendment free exercise, free speech, and association rights, as well as their Fourteenth Amendment rights to due process and equal protection. Plaintiffs also claimed violations of RLUIPA and the Michigan Constitution. Northville filed a motion to dismiss the suit for lack of subject matter jurisdiction under Federal Rules of Civil Procedure rule 12(b)(1), which the district court granted without prejudice on April 30, 2008. The district court held that the claims were unripe because Miles Christi had not obtained a final decision from the local land-use authority. Miles Christi brought this timely appeal, focusing on Frey’s intensity determination.
II.
We review an order to dismiss for lack of subject matter jurisdiction de novo. Wagenknecht v. United States, 533 F.3d 412, 415 (6th Cir.2008).
*544 A. Ripeness Requirements
Ripeness is a justiciability doctrine arising from both Article III limitations on federal judicial authority and prudential concerns. Nat’l Park Hospitality Ass’n v. Dep’t of the Interior, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). Its purpose is “ ‘to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.’ ” Id. at 807, 123 S.Ct. 2026 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).
Courts generally consider three factors to determine if a claim is ripe: (1) “the likelihood that the harm alleged by [the] plaintiffs will ever come to pass”; (2) “whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties’ respective claims”; and (3) “the hardship to the parties if judicial relief is denied at this stage in the proceedings.” Adult Video Ass’n v. U.S. Dep’t of Justice, 71 F.3d 563, 568 (6th Cir.1995) (internal alterations, quotation marks and citations omitted). The test has also been articulated as “two basic questions: (1) is the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is the hardship to the parties of withholding court consideration?” Warshak v. United States, 532 F.3d 521, 525 (6th Cir.2008) (en banc) (internal alterations, quotation marks, and citation omitted).
The United States Supreme Court has articulated an additional “finality” requirement for ripeness in the land-use context. See Williamson Cnty. Reg’l Planning Comm’n v. Hamilton Bank, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In Williamson County, a Fifth Amendment takings case, the Court held that a regulatory takings claim “is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.” Id.; see also MacDonald, Sommer & Frates v. Cnty. of Yolo, 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (holding that an “essential prerequisite” to the assertion of a takings claim “is a final and authoritative determination of the type and intensity of development legally permitted on the subject property”). Whether the decision of the appropriate governmental entity is “final” for these purposes is not dependent upon the takings claimant’s having exhausted futile or remedial appeals; what matters is that the governmental entity has been given the opportunity to apply the local regulations to the particular piece of land in question, including resolving any available variances. Id. at 190, 193, 105 S.Ct. 3108; Suitum v. Tahoe Reg’l Planning Agency, 520 U.S. 725, 736-37, 739, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (noting that “Hodel thus held that where the regulatory regime offers the possibility of a variance from its facial requirements, a landowner must go beyond submitting a plan for development and actually seek such a variance to ripen his claim,” but not requiring such requests where no discretion was permitted by regulations (citing Hodel v. Va. Surface Mining & Reclamation Ass’n, Inc., 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981))); MacDonald, 477 U.S. at 348, 106 S.Ct. 2561 (“A court cannot determine whether a regulation has gone ‘too far’ unless it knows how far the regulation goes.”). This requirement conforms with the high degree of flexibility and discretion possessed by most land-use boards and the singular nature of each particular parcel of land to which a regulation may be applied. Suitum, 520 U.S. at 738-39, 117 S.Ct. 1659.
*545 The finality requirement is a prudential rule, and may be set aside if, under the circumstances, it does “not accord with sound process” or it would be imprudent to apply it. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1012, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); Guggenheim v. City of Goleta, 582 F.3d 996, 1008 (9th Cir.2009) (“[T]he Court has explicitly held that the Williamson requirements are prudential requirements.”).
We have previously cited with approval to a threshold test used by the Second Circuit when determining whether to apply Williamson County’s prudential finality requirement to First Amendment claims in the land-use context. Insomnia Inc. v. City of Memphis, 278 Fed.Appx. 609, 614 (6th Cir.2008) (unpublished) (citing Murphy v. New Milford Zoning Comm’n, 402 F.3d 342, 350 (2d Cir.2005) and Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir.2002)). The Second Circuit held in Murphy that Williamson County’s finality requirement should be employed with caution in resolving Fii'st Amendment claims, and therefore undertook “a preliminary analysis” to determine whether it applied. Murphy, 402 F.3d at 350-51; see Dougherty, 282 F.3d at 90 (2d Cir.2002) (“[I]n the First Amendment context, the ripeness doctrine is somewhat relaxed.”). Whether it applies in a specific case is a fact-specific threshold question. Murphy, 402 F.3d at 350. To that end, the court asked “(1) whether the [plaintiffs] experienced an immediate injury as a result of [the defendant’s] actions, and (2) whether requiring the [plaintiffs] to pursue additional administrative remedies would further define their alleged injuries.” Id. at 351. This relaxed approach is consistent with Lucas, as well as our approach in other First Amendment cases. See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd., 172 F.3d 397, 406 (6th Cir.1999) (“In the First Amendment arena ... especially when there is a possibility that, rather than risk punishment for his conduct in challenging the statute, [an individual] will refrain from engaging further in the protected activity, courts have been willing to relax prudential standing limitations.... ” (alterations in original)).
In Insomnia, we noted that the Second Circuit had “declined to apply the finality requirement in a limited set of First Amendment challenges to land use disputes,” and we purported to rely on Murphy’s threshold test, finding its factors to be satisfied. Insomnia, 278 Fed.Appx. at 614, 615-16. We did not, however, go on to apply Williamson County’s analysis to determine if there was a final decision. Instead, we seemed to rely on the threshold analysis to answer that question. See id. at 616 (“Taken together, [Murphy’s] two prongs indicate that the district court acted properly in dismissing Plaintiffs claim as premature.”). Insomnia is an unpublished decision, and is not binding precedent. In order to clarify the analysis, I would hold that Murphy’s threshold test applies to First Amendment claims in the land use context, and that the threshold question is distinct from the finality determination.
I therefore would consider on review whether Williamson County’s prudential finality requirement applies to Miles Christi’s specific First Amendment claims. If it does, we must decide whether Miles Christi has a final decision for purposes of all its claims. If the finality requirement does not apply to the First Amendment claims, then we must consider the finality requirement to determine the ripeness of the remaining claims. If the finality requirement is satisfied, we must still ensure that Miles Christi’s claims satisfy Article 111 ripeness. See Lucas, 505 U.S. at 1013, 112 S.Ct. 2886; Suitum, 520 U.S. at 742-44, 117 S.Ct. 1659 (addressing general *546 ripeness concerns after holding that a final decision had been made for purposes of Williamson County). I address the immediate-harm prong of the threshold test first.
B. Murphy’s Threshold Test — Immediate Harm
The district court found that Miles Christi did not suffer an immediate harm from Northville’s decision.[1] It found that Miles Christi’s decision to cancel the Bible study and limit visitors was voluntary because Northville did not issue a cease-and-desist order. “Defendants did not require, or even suggest[,] that Plaintiffs limit the number of guests to the property.” R.50 at 11. It found further support from the fact that Miles Christi’s decision to limit visitors could not cure the reason for the infraction ticket, which was a failure to submit a site plan, and from the fact that the religious activities are currently ongoing on the property. It did not specifically consider any other harms.
Miles Christi argues that it did suffer immediate harms from Northville’s decision, including: suppression of speech in the cancellation of a Bible study due to police surveillance; the “chilling” of speech and religious activities due to the threat of vehicle tickets or zoning citations; having to pay $5000 for an unnecessary engineering study; being put to the choice of either paying for an expensive site plan or curtailing or eliminating the Order’s religious activities because of Frey’s intensity decision; and being ticketed, haled into state court, and potentially subjected to a substantial civil fine. Miles Christi stresses the First Amendment injuries, arguing that “even a momentary loss of First Amendment rights constitutes irreparable harm.” Appellant Br. at 50 (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). The Order contends that Northville’s expressed reasons are pretextual, and that the town’s actions have been motivated by discriminatory animus towards their religious activities, or a desire to placate the Order’s unhappy neighbors by forcing the Order to reduce its activities, or both. Miles Christi also claims the harms are accentuated by vague regulations’ being arbitrarily and subjectively applied to chill its protected activities. Miles Christi strongly disagrees with the district court’s finding that Northville did not require it to limit its guests or religious activities, arguing that limiting visitors was necessary to cure the “more intensive use” finding by Northville in order to prevent further claims of infraction.
Northville argues that requiring the site plan does not inflict a harm, but is merely a necessary procedural step towards obtaining a final decision; and that the civil infraction ticket is not a harm, because the proceedings have been stayed. Northville claims that the ticket can still be appealed to the ZBA, although at oral argument it contended that even that step would not result in a final decision because the local authority would still have to determine exactly what Miles Christi would have to do to conform its property to local ordinances. The town points out that Miles Christi has not yet been subjected to any fines or criminal sanctions, and claims that Miles Christi would not need to eliminate its religious activities, but merely needs to resolve the parking problem associated with the activities. Finally, Northville disagrees that its activities chilled Miles Christi’s speech.
*547 I note, as a preliminary matter, that the Supreme Court has declined to apply the finality requirement where further administrative avenues are available, if pursuit of those avenues could not result in a remedy for past deprivation. Lucas, 505 U.S. at 1012, 112 S.Ct. 2886. In Lucas, a landowner sued the state for an unconstitutional taking when a new law made development of his coastal property illegal. When the landowner filed his case, no administrative avenues were available, but the state legislature changed the law while his case was before the South Carolina Supreme Court, providing an avenue whereby a state administrative body could issue special permits for construction in the otherwise off-limits zone. Id. at 1011-12, 112 S.Ct. 2886. Despite the state’s argument that, given the new administrative avenues for relief, the landowner had not received a final decision, the South Carolina Supreme Court decided the case on the merits. Id. at 1011, 112 S.Ct. 2886. On appeal to the United States Supreme Court, the state argued that the landowner’s claim was unripe under Williamson County because he had not applied for the special permit. The Court disagreed, holding that the finality requirement did not apply to the plaintiffs claims because the special permits were available to allow future use of the landowner’s property and, even if granted, an application for special permits could do nothing to alter the fact that he had already suffered an undeniable deprivation of the use of his property. Id.
In Murphy, the Second Circuit applied the finality requirement, holding that a cease-and-desist letter, alone, was not sufficient to constitute an injury. The plaintiffs held large Christian prayer meetings in their home, hosting between 10 and 60 persons weekly. Murphy, 402 F.3d at 345. After the neighbors complained about the traffic, number of cars, and noise from these gatherings, the town investigated and then sent an informal letter to the plaintiffs, advising them that the large prayer meetings were not a “customary accessory use in a single-family residential area.” Id. Two days later the plaintiffs sued in federal district court. The town later sent a formal cease-and-desist letter, which the plaintiffs incorporated into their amended complaint. The plaintiffs did not appeal the cease-and-desist order or request a variance. The district court found for the plaintiffs and issued an injunction against enforcement of the regulations. The Second Circuit reversed. First, it held that the cease-and-desist order did not subject the plaintiffs to an immediate injury. The town did not have the power to enforce the letter by arrests or fines without taking the additional step of bringing an action in state court, so there was no threat of immediate harm. Id. at 351. Also, an appeal of the order to the zoning board would have yielded an automatic stay of enforcement.[2] Next, the court held that the record was insufficiently developed, and that further administrative actions below would help to define it. Id. at 351-52. The court relied heavily on the zoning board’s power under Connecticut law to find facts and apply zoning regulations to those facts, and to review the town’s decision de novo. Id. at 352. Accordingly, the court applied the finality requirement, and because the plaintiffs did not request a variance or appeal the cease- and-desist order to the zoning board, the *548 court held that no final decision had been rendered. Id.
In Insomnia, we held that the requirement to file a new plan is not an immediate injury in the context of an administrative process voluntarily instigated by the plaintiff. Insomnia, 278 Fed.Appx. at 615-16. The plaintiff corporation alleged that the Land Use Control Board (“LUCB”) denied its application to subdivide two parcels of land into three out of hostility to the “adult entertainment” industry. The LUCB instructed Insomnia Inc. to resubmit its application as a planned development instead of a subdivision, which would allow closer regulation of the property. Id. at 611. Insomnia Inc. appealed the denial to the Memphis City Council, was denied, and then sued in federal district court claiming First and Fourteenth Amendment violations. Applying the reasoning from Murphy, we held that (1) Insomnia did not suffer an immediate injury because it could file a new plan per the LUCB’s instructions, and (2) that the possible rejection of the new application would further refine the contours of Insomnia’s claims and aid future judicial consideration. Id. at 615— 16. We applied the finality requirement to Insomnia’s claims, held that there was no final decision, and affirmed the district court’s dismissal.
I believe that, taken in context of the record as a whole, Northville’s actions went further than the actions of the municipal actors in either Murphy or Insomnia. Context is vital in these cases because First Amendment rights are subject to close protection. “The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.” Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Brennan, J., plurality opinion); Jones v. Caruso, 569 F.3d 258, 277 (6th Cir.2009) (same). One reason First Amendment rights are stringently protected is “ ‘the intangible nature o[f] the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.’ ” Newsom v. Norris, 888 F.2d 371, 378 (6th Cir.1989) (quoting Cate v. Oldham, 707 F.2d 1176, 1188-89 (11th Cir.1983)). “[Cjonstitutional violations may [also] arise from the deterrent, or ‘chilling,’ effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.” Laird v. Tatum, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).
Miles Christi has alleged sufficient “immediate harms” that it would be imprudent to apply the finality requirement to its claims. First, Miles Christi claims that it cancelled a Bible study on account of the pretextual police surveillance. This alleged harm occurred at a specific time in the past, and like the landowner’s takings claim in Lucas, cannot be cured by a later administrative ruling. Second, it claims that Northville’s threats to ticket cars parked on the grass and the potential for further civil infraction tickets “chilled” the Order’s religious activities. This is likewise an immediate harm to protected First Amendment activities.[3]
Third, Miles Christi paid $5000 for an engineering estimate. Although in Insom *549 nia we did not conclude that requiring the plaintiff to file a new development plan was a harm, that case is distinguishable because there it was the plaintiff who sought a change in use and voluntarily initiated the administrative process that then had to be followed until a final decision was rendered. Here, Miles Christi desires only to use its property as it always has and is allegedly being subjected to the review process on pretextual grounds; it is Frey’s decision that necessitated this cost, and Miles Christi therefore suffers an immediate harm if its theory of the case is borne out.
Finally, Frey’s decision put Miles Christi to the choice of submitting an expensive site plan or drastically curtailing or ceasing its protected activities. When it refused, it was ticketed, haled into state court, and now faces the potential of a civil fine. As noted, this case is not like Insomnia, or most other land-use cases, because Plaintiffs did not seek a change in use on their own and in fact claim that their use has not changed. It is also unlike Murphy, where the town had not yet taken the step of bringing the plaintiffs to court in order to subject them to a civil penalty. Here, Northville has tried to force Miles Christi into an expensive — and, Miles Christi claims, unwarranted — site review process and haled it into state court when it refused. Miles Christi has suffered immediate harm.
Miles Christi’s claim that Northville’s reasons are pretextual is supported by Northville’s statement at oral argument that “football parties and tailgate parties” do not change “the residential nature of the use; whereas, what they’re doing here, they’re doing religious education and they’re worshipping.” When challenged by this Court counsel retreated from that statement, and I do not rest my conclusions on it; neither, however, can I simply ignore its troubling implications.
Because I would hold that Miles Christi has alleged sufficient immediate injuries, I need not address whether requiring Miles Christi to pursue additional administrative remedies would further define its allegations, and I would hold that the finality requirement does not apply to its First Amendment claims.
C. Frey’s decision was “final”
In order to determine if Miles Christi’s remaining claims under equal protection, due process, and RLUIPA are ripe, we must determine if Miles Christi has received a final decision. I would hold that it has.[4]
As I have already noted, “the finality requirement is concerned with whether the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury.” Williamson County, 473 U.S. at 192, 105 S.Ct. 3108. The developer in Williamson County sued the local land planning committee in a § 1983 action for an unjust taking of its property by the application of various land-use regulations. Id. at 175, 105 S.Ct. 3108. After the developer received approval for a preliminary plat and spent considerable resources on initial construction, the planning commission changed several applicable zoning ordinances and applied those changes to the developer’s final plat applications. Id. at 177-79, 105 *550 S.Ct. 3108. These new regulations arguably rendered the project economically unfeasible. The planning commission then rejected the revised plat on a number of grounds. Although the Board of Zoning Appeals ruled in favor of the developer on appeal, the planning commission declined to follow the Board’s ruling and rejected the final plat application. Id. at 181-82, 105 S.Ct. 3108. The owner then filed suit under § 1983. A jury found for the developer, and the case was appealed all the way to the Supreme Court. The Court reversed, holding the matter unripe. Id. at 186, 105 S.Ct. 3108. While the Court based its decision on two grounds, only the first, the finality requirement, is relevant here.[5]
Relying heavily on the specific local procedures, the Court held that the developer had not obtained a “final decision” because it did not apply for available variances from the Board or the commission. Id. at 188-89, 105 S.Ct. 3108. Between the commission and the Board, the developer could have pursued up to five variances, any or all of which would have significantly ameliorated the commission’s eight objections to the plat. This was critical because unless the developer applied for variances before submitting the plat for approval, the commission could reject the plat on any grounds, including those that could well be covered by variances. Id. at 190, 105 S.Ct. 3108. Also, without knowing which regulations would or would not ultimately apply, a court could not determine whether the local rules would allow the developer to build his subdivision in an economically feasible way, and therefore neither a court nor a jury could value the taking.
The Court was careful to distinguish “finality,” which was required, from “exhaustion,” which was not. “[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury....” Id. at 193, 105 S.Ct. 3108. Exhaustion, however, “generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.” Id. To illustrate the difference, the Court provided several examples. The developer would not have had to seek a declaratory judgment in state court to challenge the zoning actions because such an action would “clearly [be] remedial.” Id. at 193, 105 S.Ct. 3108. “Similarly, [the developer] would not be required to appeal the Commission’s rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission’s decisionmaking.” Id. These procedures “would result in a judgment whether the Commission’s actions violated any of [the owner’s] rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow [the owner] to develop the subdivision in the manner [the owner] proposed.” Id.
The Second Circuit has outlined four policy considerations that underlie the finality requirement in land-use cases:
First, ... requiring a claimant to obtain a final decision from the local land use authority aids in the development of a full record. Second, ... only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a partieu *551 lar parcel. Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes.... Finally, ... federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary’s appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.
Id. at 348 (internal citations omitted); see Insomnia, 278 Fed.Appx. at 613 (citing Murphy factors).[6]
We have held plaintiffs RLUIPA and equal protection claims unripe where the plaintiffs position before the local land use authority was undefined. Grace Cmty. Church v. Lenox Twp., 544 F.3d 609, 618 (6th Cir.2008) (hereinafter “Grace Church ”). In Grace Church, a local Christian church applied for a special use permit to operate a residential facility. 544 F.3d at 611. The town granted the permit, but with several restrictions. Id. When the commission investigated an alleged violation, the pastor appeared before the commission but had no comment. Id. Faced with the one-sided evidence, the commission revoked the permit, and the church did not seek reconsideration, apply for a new permit, or appeal. Instead, it filed suit a year later in federal district court claiming violations of RLUIPA and equal protection. The district court dismissed for lack of ripeness, and we affirmed. Relying on Murphy’s policy considerations, we found that the record was insufficiently developed because the church was essentially silent during the local proceedings. Id. at 616. Furthermore, the church had not availed itself of any of the available avenues for local relief, denying the town the opportunity to render a final decision. Id. Therefore, we dismissed the suit as unripe.
The district court held that because Miles Christi did not appeal Northville’s decision to the ZBA or otherwise avail itself of the zoning process, it did not obtain a final decision. Miles Christi responds that the district court confused exhaustion with finality, that Frey was the initial decisionmaker as empowered by local regulations, and that her testimony for Northville is determinative of Northville’s final position on the matter under Fed. R.Civ.P. 30(b)(6). Northville argues that the ripeness doctrine requires that Miles Christi obtain a decision from either the Planning Commission or the ZBA. It further argues that Frey did not make a final decision, asserting instead that Miles Christi’s actions triggered the events and Frey merely determined the next procedural step under the regulations. Finally, Northville argues that the ZBA has authority to modify, reverse, or affirm actions on appeal, and an appeal would not be futile.
I again note that Northville and the majority improperly conflate Frey’s intensity determination with the possible end result of the zoning process. Because the two issues are distinct, and because Miles Christi focuses its complaint on the former, we must focus on Frey’s decision and its effects. See also Suitum, 520 U.S. at 739, 117 S.Ct. 1659 (distinguishing the determination that the petitioner’s land fell within a protected zone from petitioner’s possible option to apply for the right to *552 transfer her building rights and focusing only on the former). After analyzing the decision and its effects, we must then examine Miles Christi’s available administrative options and determine whether each is part of Northville’s process for arriving at “final decisions,” which would preclude a finding of finality, or whether they are purely “remedial,” which would not. Just as Williamson County was guided by the contours of the local rules, so is my analysis here.
At the meeting with Fr. Bertolacci, Frey informed him that she had determined that Miles Christi’s use of its property had intensified to the point where it had become a non-residential use. That determination was within her authority as Director of Community Development. As a result, Northville demanded a site plan and issued a civil infraction ticket when Miles Christi did not comply. As explained above, that ticket had the effect of haling Plaintiffs into state court.
Following Frey’s determination and the issuance of the ticket, Miles Christi had a number of administrative options available to it. First, the Order could have appealed Frey’s decision requiring a site plan to the ZBA under Northville Code § 170-41.4(A). This section allows for an “appeal” to the ZBA “by any person ... affected by a decision of the ... Director of Community Development.” The ZBA would conduct a hearing, and could reverse or modify the decision “only if it finds that the action or decision appealed meets at least one of the following criteria: (a) [w]as arbitrary or capricious; (b) [w]as based on an erroneous finding of fact; (c) [constituted an abuse of discretion; or (d) [w]as based on [an] erroneous interpretation of this chapter.” Id. at § 170-41.4(A)(3) (emphasis added). This option is remedial.
While the majority opinion attempts to paint this option as something else — an “ordinance interpretation” — it is purely an “appeal,” similar to the appeal available to the plaintiff in Williamson County, which the Supreme Court held the plaintiff did not need to exhaust to have a final decision. Here, the ZBA was not involved in making the initial decision and would be merely reviewing Frey’s decision.[7] Although the ZBA’s standard of review is not a dispositive factor, I would note that the review here would likely not be de novo, as in Murphy, but would be done with some level of deference. Miles Christi did not have to exhaust this option.
Second, Miles Christi could file with the Planning Commission a request for a waiver from, or modification of, the parking and landscaping requirements under Northville Code §§ 170-24.13 and 170-26.1(E), or seek a variance from the ZBA under § 170.41.4(A)(5) and (6). It is unclear whether Miles Christi could request such relief before filing a site plan, but given the review requirements that appears unlikely. It is clear that these options have not been explored, and that a final decision on how the parking and landscaping regulations would apply has not been reached. However, none of these options can serve to modify Frey’s intensity determination. Instead, they are remedial measures, designed to address only the consequences of Frey’s determination. Miles Christi’s claim all along, however, has been that the intensity determination, itself, was incorrect. These options, therefore, do not impact the finality of Frey’s *553 intensity determination, and Miles Christi did not have to exhaust them.
Finally, Miles Christi could file for permission from the Planning Commission or the ZBA to file a less-demanding site plan. Article 33 covers site plans, and exempts single family homes from having to submit one. Id. at § 33.2(A). The article, however, requires a “full site plan,” not one of three less demanding options, when there is “[a]ny change in the use of the land or a building to a more intensive use, in terms of parking needs, noise, traffic volumes and similar impacts.” Id. at § 33.2 (table). This article does not appear to contain a provision for less extensive review. Regardless, this option suffers from the same infirmity as the last, because Miles Christi would still be subject to Frey’s decision that a more intensive use occurred, and even if the site plan requirement were less rigorous, the Order would still have to participate in a process it did not initiate or face the consequences for continuing its activities.
One thing Miles Christi could not do was file a request for a variance to be free from the site plan requirement. After a thorough review of the regulations, I find no variance listed in § 170-41.4(B)[8] that applies to this circumstance, nor is there any “catch-all” clause. Even if a use variance could provide relief, in order to qualify for such a variance Miles Christi would have to show that “the site cannot reasonably be used for any of the uses allowed under current zoning,” something it clearly could not do. Id. at § 170-41.4(B)(6)(b). Applying for such a variance would be futile, as the ZBA does not have the authority to alter any of the terms of the ordinance. Id. at § 170-41.6.
Given these available options, I would hold that, while Miles Christi has not exhausted its opportunities for administrative relief, it has obtained a final decision sufficient to ripen its claims. Frey, the initial decisionmaker, was empowered as the Director of Community Development to make the decision she did for North-ville. That decision is subject to local appeal, but exhausting appeals is not required under Williamson County. Other available actions would not change Frey’s decision that Miles Christi’s use of the property had become more intensive. Therefore, “the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury,” and Miles Christi has obtained a final decision.
This result is supported by Murphy’s policy considerations, because (1) the record on the narrow question is sufficient, (2) the regulation is being applied to this parcel to require a site plan, and (3) the available variances do not provide the requested relief. The fourth factor, the respect for federalism, which is particularly strong in local land-use situations, does not support this conclusion, but no single factor is dispositive.
Frey’s allegedly unwarranted decision also distinguishes this case from Grace Church. Unlike in that case, where the Church had sought the special permit and then refused to cooperate in developing a full record, Frey’s decision thrust the site review requirement upon Miles Christi. The fact that Miles Christi did not participate in the process is irrelevant here because the very question before us is whether it can be forced to. Also, the parties developed a full record of the events lead *554 ing up to Frey’s decision in state court. The parties’ positions are well defined and ready for adjudication.
Because Miles Christi suffered an immediate injury, the finality requirement does not apply. Even if it did, Miles Christi has obtained a final decision from the initial decisionmaker. I turn, finally, to the general ripeness standards to ensure that they are also satisfied.
D. Miles Christi’s claim satisfies general ripeness requirements
As stated above, the general test for ripeness has been articulated as “two basic questions: (1) is the claim fit for judicial decision in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is the hardship to the parties of withholding court consideration?” Warshak v. United States, 532 F.3d 521, 526 (6th Cir.2008) (en banc) (internal alterations, quotation marks, and citation omitted).
Given the foregoing discussion and the substantial overlap in the inquiries, I conclude that these factors are satisfied. The concrete factual context is Northville’s conduct, Frey’s intensity determination, and the resulting harms alleged by Miles Christi. Because the majority withholds judicial consideration, Miles Christi will have no recourse but to engage in the zoning process it did not initiate and argues was unlawfully required, and which cannot provide a complete remedy, or to cease or scale back its religious activities in the hope of avoiding future problems. Even the latter approach, however, will not prevent Miles Christi from being fined in the already progressing state court suit. Accordingly, I would hold that Miles Christi’s claims are ripe, and that the district court erred in dismissing them.
III.
I would reverse the district court’s dismissal for lack of subject matter jurisdiction and remand for further proceedings. Accordingly, I respectfully dissent.

. I note that the district court, following Insomnia, did not structure the analysis in the form of a threshold question. Rather, it first decided that there was no final determination, and then analyzed the two-part test from Insomnia and Murphy. See R.50 at 11. My proposed clarification of the test would prevent this improper approach in the future.

. Whether this should have been considered against the plaintiffs is questionable. While Williamson County’s holding was dependent on the local laws and the relative powers of local entities, it was clear that a land-owner does not have to seek an appeal of an initial determinative decision. The specific authority of the body that is "appealed to” is critical, as Williamson County explained by differentiating between finality and exhaustion. See infra Part II.C.

. These first two harms cannot be redressed by any relief that the ZBA may potentially provide. The majority dismisses these harms as ones that can be cured by an appeal to the ZBA, which may resolve the issue such that Miles Christi would not have to cancel any religious activities. Notwithstanding the majority’s assertion, the ZBA's hypothetical relief would do nothing to cure the past harms that Miles Christi has already suffered. Thus, "the consequences of staying our hand" would be that Miles Christi's harms would never be redressed.

. I would further note that my conclusion on the First Amendment claims is supported by this determination. See Lucas, 505 U.S. at 1012 n. 3, 112 S.Ct. 2886 (explaining that the plaintiff had received a final decision after holding that the requirement did not apply to his claims); Guggenheim, 582 F.3d at 1011— 12 (holding that the prudential finality requirement did not apply, but noting that the conclusion was supported by the fact that the plaintiffs "substantially satisfied the Williamson requirements”).

. The second ground required the owners to “utilize the procedures Tennessee provides for obtaining just compensation,” a requirement not applicable to this non-takings suit. Id. at 186, 105 S.Ct. 3108.

. Notwithstanding the unfortunate phrasing of the second policy consideration, that the owner should “exhaustf] the variance process,” Murphy recognized Williamson County’s distinction between finality and exhaustion. See Murphy, 402 F.3d at 349 (recognizing that Williamson County does not require futile or remedial "exhaustion”).

. The majority opinion concludes, with minimal discussion of the local ordinances, that the ZBA is "empowered to participate in the decisionmaking process from the outset.” A plain reading of the local ordinances and the facts of this case show that conclusion to be clearly wrong.

. The majority opinion repeatedly refers to the obligation of Miles Christi to seek “an ordinance interpretation or variance” yet, tellingly, never identifies a single ordinance interpretation or variance available to Miles Christi. The reason for this omission is simple — none exists.